421 S.E.2d 227

**STATE of West Virginia, Appellee,**

v.

**Marvin John THOMAS, Appellant.**

**No. 20676.**

Supreme Court of Appeals of West Virginia.

Submitted April 28, 1992.

Decided July 15, 1992.

---

Teresa A. Tarr, Asst. Atty. Gen., Mario J. Palumbo, Atty. Gen., Charleston, for appellee.

George Cosenza, Cosenza & Underwood, Parkersburg, for appellant.

NEELY, Justice:

A jury convicted Marvin John Thomas of murder in the first degree, sexual assault in the first degree and abduction. Mr. Thomas now appeals, and we reverse and remand.

### I.

On 28 November 1986, Janet Miller, the victim of the alleged crimes, appeared in Parkersburg to visit her boyfriend Jeffrey Mosier.[1] Ms. Miller went to the Player's Club, where she found Mr. Mosier and they argued. Defendant, Marvin John Thomas, bought Ms. Miller a drink. A short time later, after further argument between Mr. Mosier and Ms. Miller, Mr. Thomas asked Ms. Miller to dance. Ms. Miller accepted, and the couple danced one slow dance and went their separate ways within the Club.

Around 11:00 p.m., Ms. Miller left the Player's Club. Defendant Thomas was seen leaving the club a little later than Ms. Miller. Mr. Mosier seemed upset but stayed a while longer, leaving at 11:45 p.m. Both Mr. Mosier and the defendant, Mr. Thomas, claimed they went straight home and went to sleep. Defendant's mother and sister testified that defendant was home by 12:30 a.m., while Mr. Mosier alleg-

---

1. "Boyfriend" is used loosely. It was apparent that Mr. Mosier and Ms. Miller were not on good terms by the evening in question. An excerpt from Mr. Mosier's testimony should make this clear:

I said, "Hi, how are you, what are you doing here?" ... she said, "How long did you think it would take before I showed up?" I said, "What do you mean?" She said, "You haven't called, we haven't communicated." ... She said she had heard I was with another lady and she wanted to know what was going on and all kinds of things, and I told her it wasn't true. She was upset. She said she had heard that and she wanted to know, and she was mad.

Transcript at 638–639.

edly made a telephone call to a friend when he arrived home.

The next morning, Mr. Mosier found the victim's car still in the parking lot of the Player's Club and left a note, saying:

> I knew you would do this. It's 5:30 a.m. and I am going to work. How about you! Ha. Hope it was good and you didn't catch anything. You are a bitch, just like the rest.

Transcript at 647. Meanwhile, the police had begun to search for Janet Miller after the hotel where she had been staying reported her missing. Janet Miller was next seen on 10 December 1986 when her body was discovered at the closed Sundowner Drive–In.

The investigation of Ms. Miller's murder focused on two persons: Mr. Mosier (the victim's boyfriend) and the defendant. The Parkersburg police contacted the F.B.I. Psychological Evaluation Unit. The Parkersburg police related a description of the circumstances surrounding the disappearance and murder to the F.B.I., and the F.B.I. gave the police a psychological profile of the likely murderer.[2] The police were able to fit both Mr. Thomas and Mr. Mosier into the profile. The F.B.I. examined the victim's car and found the fingerprints of Mr. Mosier, but not the fingerprints of the defendant.

The police, unable to differentiate any further between the suspects, sought search warrants to search the cars and homes of both suspects. Detective G.A. Waybright obtained the warrant to seize Mr. Thomas' car. In his affidavit, Detective Waybright averred:

> Due to the association of Marvin John Thomas with Janet S. Miller in the Player's Club, the discrepancies in his statements given to Detective Bureau personnel ... and the similarities between the personalities of Marvin John Thomas and that of the murderer indicated in the Federal Bureau of Investigations [sic] Psychological Profile, *your affiant* has reason to believe and *does believe* that Marvin John Thomas was involved in the abduction, assault and subsequent murder of Janet S. Miller. [Emphasis added]

Affidavit Supporting Search Warrant dated 12 December 1986 at 8. One factor that Det. Waybright relied upon in his affidavit to link Mr. Thomas to the psychological profile was a report that Mr. Thomas had at one time physically abused an ex-girlfriend, Jennifer Moorehead. This was a false report that Det. Waybright later attributed to a "miscommunication."

In an affidavit sworn in front of the same judge at the same time, a different officer, Detective J. M. Spellacy, sought a search warrant to seize Mr. Mosier's car. Primarily relying on the identical facts, the same F.B.I. psychological profile and a failed polygraph examination, Det. Spellacy swore in his affidavit, *"[y]our affiant believes* and has cause to believe that the crime of first degree murder of Janet S. Miller was committed by one Jeffrey L. Mosier. [Emphasis added]"* Affidavit Supporting Search Warrant dated December 12, 1986, at 9. Despite the fact that two officers, working together and relying on the same facts, each swore that they believed that a different person committed the crime, Judge Gustke (the same judge who conducted the trial) found probable cause to issue both search warrants.

Under authority of the warrants, the cars were seized and sent to the F.B.I. crime lab. The F.B.I. thoroughly searched and examined both cars. The F.B.I. agents reported that they found nothing of significance in their search of either Mr. Mosier's or Mr. Thomas' car. Upon completion of its examination of the cars, the F.B.I. returned both cars to the Parkersburg police impound lot. The Parkersburg police then searched Mr. Thomas' car a second time. They ripped out the right back seat cover and left rear floor mat, and sent them back to the F.B.I. lab for further examination. This time, the F.B.I. found one tiny bloodstain on the bottom of the back seat cover and a solitary hair on the floor mat.

---

2. *See* Appendix A and Appendix B for the way in which the Parkersburg police employed the same psychological profile to implicate Mr. Thomas and Mr. Mosier.

Despite the bloodstain's age, small size and unknown history, the F.B.I. performed an electrophoresis examination on the sample. Special Agent Randall Murch, who conducted the test, concluded that 1.3 percent of white people have the combination of enzymes discovered in the bloodstain and that Janet Miller was in that small group. In order to perform the electrophoresis test, however, the F.B.I. used up the entire bloodstain sample. Defendant had no opportunity to have an expert perform an independent analysis of the evidence, nor were the FBI's slides or other raw data available for independent examination by defense experts. The only evidence that could be presented to the jury was the oral testimony of the FBI expert and difficult-to-decipher lab notes.

## II.

Defendant alleges several errors relating to the electrophoresis tests. Defendant asserts that: electrophoresis tests of bloodstains are inherently unreliable; the test performed in this case was performed on unreliable materials; and, the destruction of the entire bloodstain without preserving some of the material that was tested or photographs of the test results themselves for independent analysis violated *Brady v. Maryland* and the Sixth Amendment.

## A.

In *State v. Woodall*, we held:

We find nothing inherently unreliable in statistical evidence based on blood-typing and enzyme tests. First, blood tests themselves are reliable *when properly conducted*, and these tests are valuable only when their results are placed in the context of statistical probabilities. [Emphasis added]

182 W.Va. 15, 385 S.E.2d 253, 261 (1989). Nothing in scientific research since 1989 has forced us to re-examine this holding.[3]

Solely because electrophoresis testing in general is reliable, however, is no assurance that the test performed in any given circumstance, no matter how bizarre, is necessarily reliable. Indeed, most of the criticism leveled against forensic use of electrophoresis comes not from objections that the test is inaccurate *per se*, but rather from objections to the specific methodology employed in performing a particular test.

In her letter, *The Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 8 (1984), Dr. Diane Juricek identifies several factors in electrophoresis testing that could result in a wrong result. Dr. Juricek cites such factors as age, exposure to heat, and possible contamination that can all lead to incorrect results. Although it is possible to control for most known factors,[4] such control cannot be au-

---

**3.** In its brief, the State requests that we hold that a *Frye* hearing is no longer necessary in future cases involving electrophoresis. "When senior appellate courts have concluded that a test is generally accepted by the scientific community, a trial court may take judicial notice of a test's reliability." Syl. Pt. 2, *State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989).

There is no controversy that the electrophoresis test, in general, is a reliable test. *See* Bruce Budowle and Robert C. Allen, *Electrophoresis Reliability: I. The Contaminant Issue*, 32 J. Forensic Sci. 1537 (1987); Sensbaugh, *Response to "The Misapplication of Genetic Analysis in Forensic Science"*, 29 J. Forensic Sci. 12 (1984). At the same time, much research has been done into the limits of the test and ways to correct for types of contamination. *See, e.g.*, Denault, Takimoto, et al., *Detectability of Selected Genetic Markers in Dried Blood on Aging*, 25 J. Forensic Sci. 479 (1980). Most of the dissent from support of the test is not focused on the test itself but on methods for controlling it. *See, e.g.*,

Juricek, *The Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 8 (1984); Juricek, *Electrophoresis: A Continuation of the Discussion*, 29 J. Forensic Sci. 704 (1984).

Accordingly, no *Frye*-type hearing will be required in the future for judicial notice of the reliability of the test *in general*. This does not mean that a full cross-examination of the results of a test should be hindered in any way. *See Woodall*, 182 W.Va., at 22, 385 S.E.2d, at 260.

**4.** *See* George F. Sensbaugh, *Response to "The Misapplication of Genetic Analysis in Forensic Science,"* 29 J. Forensic Sci. 12 (1984). Sensbaugh oversimplifies Dr. Juricek's criticism in his defense of the use of electrophoresis in forensic science by drawing the conclusion that her belief is that it should never be used. The proper conclusion to draw from the criticism and the responses is that electrophoresis can be performed correctly, but there are many confounding factors that might interfere with a

tomatically presumed in the conduct of an electrophoresis test.

In a follow-up letter, Dr. Juricek clarifies her position and describes the methods for ensuring reliable electrophoresis test results. Dr. Juricek recommends the use of controls to take into account heat exposure, age, chemical contaminants, additives and other possible environmental agents that can distort the response of the sample when subjected to electrophoresis examination. After completion of the electrophoresis analysis, Dr. Juricek suggests the test be replicated whenever possible. Finally, Dr. Juricek urges that photographs of the electrophoresis slides be taken so that others may conduct independent verification of the results.[5]

The responses to the suggestion of preserving as much as possible by photograph for independent verification has drawn disagreement from some forensic scientists. However, the objection to taking photographs appears to have little to do with determining the reliability of a given test, but instead focuses on the determination by scientists practicing in the forensic field that they do not want to be questioned about their analysis. For example, Dr. Simon J. Baxter commented in his letter, *Electrophoresis in Forensic Sciences*, 30 J. Forensic Sci. 994, 995 (1985):

In the courtroom context reference would have to be made to record books in order to identify the samples in question and in addition the analyst could be examined on his photographic qualifications.

The whole situation can be seen to be a farce where interpretation of data from a leisurely examination by an isolated observer (of unknown relative experience) of a photograph (of untested quality) of the analysis of a sample (of assumed identity) with an unknown history performed by an operator (of unknown competence, reliability, and impartiality) is accepted by the court.

Dr. Baxter continues his harangue against outside review by people who are not full-time forensic scientists by describing the plight of the forensic scientist, "Not for him the leisurely pace of research, attendance at many scientific meetings, but the ever present deadline and *harassment in court.*" [Emphasis added.] *Id.*

There is some evidence in the record that Special Agent Murch, the F.B.I. expert who conducted the electrophoresis test, supports Dr. Baxter's negative view of independent review. Dr. Murch declared that the F.B.I.'s rationale for not taking photographs was that the FBI experts did not want their conclusions to be second-guessed by defense experts:

We believe that if the defense counsel and his experts wish to challenge us or reproduce our work, then they can make the test ... [they can] re-test using their own methods in their own laboratories.

Transcript at 1391. We agree that ideally a defendant should be given samples and allowed to conduct his own test. However, when a "re-test" is clearly not an option, as when the State uses up all of the available sample, providing photographs of the electrophoresis slides is the best option available to assure reliability through independent review of the test performed.

Cross-examination is the engine of truth; in order for evidence of scientific tests to be considered reliable by the courts, the tests must be subject to the fullest cross-examination possible. In this case, the opportunity for effective cross-examination and careful inquiry into methodology was denied by the State's failure to preserve the electrophoresis test. This is a problem of the first order: should it be present in a criminal trial, pseudo-science is eminently convincing because it is accompanied by all the mumbo-jumbo of real science.

**B.**

The right of an accused to a fair trial and the right to a full and fair cross-examina-

---

correct analysis. *See also,* Bruce Budowle, Ph.D. and Robert C. Allen, Ph.D., *Electrophoresis Reliability: I. The Contaminant Issue,* 32 J. Forensic Sci. 1537 (1987).

5. Diane K. Juricek, *Electrophoresis: A Continuation of the Discussion,* 29 J. Forensic Sci. 704 (1984).

tion of the witnesses against him require that the State be prepared to provide a defendant with a reasonable opportunity to examine adverse evidence presented by the State's experts. In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the U.S. Supreme Court has held that due process requires prosecutors to reveal all potentially exculpatory evidence to the defendant.[6]

█ We have recognized this right under the West Virginia *Constitution* as well:

A prosecution which withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.

Syl. Pt. 4, *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982).

More important, however, than the technical language of *Brady*-type cases is the policy on which *Brady* is grounded. As Justice Douglas wrote:

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' [Footnote omitted] A prosecution that withholds evidence ...

which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.

*Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1962).

Despite the policy of *Brady,* the State maintains in the case before us that it was under no obligation to photograph the electrophoresis tests because the defendant did not make a showing that the evidence *which he did not possess* was *in fact exculpatory.* This is a highly disingenuous contention for two reasons. First, the State itself declared, "[p]erhaps the most crucial evidence linking the defendant to the crime was the physical evidence."[7] The State then proceeds to describe the most crucial elements of the "physical evidence" being the blood comparisons; i.e., the electrophoresis tests. Second, in order for a defendant to make the exculpatory showing that the State suggests is required before the State must take photographs of the electrophoresis slides, the defendant needs already to know the methodology and results of those tests.[8] Such a high threshold creates an unfair "Catch–22" situation.

█ Although the materiality of the potentially exculpatory evidence is clear in this case,[9] not every test performed by a

---

6. "We now hold that suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1962). In the case before us, of course, there is no question of "suppression" or of any other untoward conduct on the part of the State.

7. Appellee's Brief at 15.

8. In *People v. Garries,* 645 P.2d 1306 (Colo. 1982), the Colorado Supreme Court held that the failure to preserve evidence of a forensic test was grounds for reversal. However, the State maintains that *Garries* should be distinguished from the case before us. The rationale for this distinction, the State maintains, is that the prosecution in *Garries* stipulated that the bloodstain in question was potentially exculpa-

tory and material to defendant's case. In other words, the State suggests that a defendant's right to potentially exculpatory evidence depends on the generosity of the prosecutor. This we cannot accept.

9. Realistically, the State would not go through the inconvenience and expense of performing an electrophoresis examination on a blood stain if it were not important to its case.

Furthermore, in this case there are two suspects for which the evidence can almost equally be made to fit. An examination of the two search warrants issued on December 12 clearly show that all of the circumstantial evidence can easily be made to fit either Mr. Mosier or defendant. *See* Appendices A and B. The primary evidence that links defendant to the crime to the exclusion of Mr. Mosier is the electrophoresis test. The test is clearly material evidence.

State officer in every criminal case is in the same category.[10] We do not hold today that photographic evidence of every test performed by a government officer in every circumstance must be taken. We do not intend to burden every police officer who measures tire tracks with a requirement to preserve evidence when the test requires little or no interpretive skill and all the dangers that emerge from the "pseudo-science" problem are not present. However, when the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent replication of the test, the State must preserve as much documentation as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts.

■ Furthermore, as we discussed above in Part II A, the precondition for accepting the scientific test as relevant evidence is the ability of a defendant to examine fully the results. This is the only reliable method the courts have to determine the accuracy of a given test. As we held in *Woodall:*

> The party seeking to impeach blood test evidence is free to cross-examine the proponent's experts and offer experts of his own to discredit the conduct of the tests and the underlying statistical probabilities.

182 W.Va. at 23–24, 385 S.E.2d, at 261–262. In order to make that right of cross-examination meaningful, the State must do its utmost to preserve evidence of the tests it performs.

■ Taking photographs of the slides used in an electrophoresis examination is an acceptable laboratory procedure for which the technology is readily available.[11] When a test uses up an entire sample, photographic documentation of the test gives an independent expert a view of how the test was performed. In addition to photographs, the State should also provide the laboratory notes, reports, and any other records of the test in question. Such documentation is required to simulate, as closely as possible, the independent review that would have been conducted were there enough of a sample to provide to the defendant.[12]

In an ideal world, the State would be able to preserve enough of the sample that a completely independent test could be performed.[13] However, we recognize that given the necessities of certain tests and the small quantities of available material, preservation of enough of the sample for an

---

**10.** Our ruling today does not change our holding in *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989), that the failure of the State to provide every possible piece of evidence is not necessarily reversible error.

**11.** In the exchange of letters in 29 *J. Forensic Sci.* 8–16 (Jan.1984), the merit of using electrophoresis in forensic science is sharply debated. However, both sides did agree on one thing: that photographs can and should be taken of electrophoresis tests so review can be conducted:

> Dr. George Sensbaugh (in his letter defending the forensic use of electrophoresis) wrote:
>> The quality assurance programs operating in most crime laboratories prevent analysts from employing a marker until they have developed the critical judgment to work with that marker. In addition, many laboratories have an established policy that typing judgments require independent assessments by two or more analysts. *It is also the rule in most laboratories that typing gels are documented photographically.* These safeguards are in effect to minimize risk of analyst error. [Emphasis added.]

*Id.* at 13.

**12.** Although a defendant may be entitled to photographic documentation of test results, we do not hold today that a defendant is necessarily entitled to the camera angles of his choice. In general, we do not want extended litigation over the sufficiency of documentation. If the State reasonably documents the results of the test, then that will be sufficient to overcome any constitutional infirmities with the admission of test results into evidence.

**13.** Dr. Simon J. Baxter commented in his letter, *Electrophoresis in Forensic Sciences,* 30 J. Forensic Sci. 994, 995 (1985):

> [T]he only truly scientific way of testing the crime lab work is to retain relevant material where possible, at ultra-low temperatures so that any independent scientist can actually analyze the material personally. This has the advantage that the independent verifier has as complete a knowledge as possible of the sample and also such an expert can be vigorously tested in court as to his competence, experience and so forth.

independent test may not be possible. That is why we accept the general proposition that the State does not commit a violation when it, in good faith, uses up the entire sample in performing a necessary scientific test. With that "right" comes a responsibility: the State must put the defendant in as nearly identical a position as he would have been in had he been able to perform an independent test.

In this case, the State did not preserve the sample for independent testing by defendant, nor did the State preserve the results of the test it performed by taking photographs of the electrophoresis results. The State therefore deprived Marvin John Thomas of his right to a full and fair cross-examination of the expert who performed the electrophoresis test. Accordingly, we find that the circuit court committed reversible error by denying defendant's motion to suppress the results of the electrophoresis examinations of the evidentiary bloodstains.

### III.

Defendant alleges three different errors relating to the search warrant: (1) the affidavits did not contain all information available to police; (2) there was no probable cause because the police were able to use the identical information to get warrants to search the cars and premises of two suspects; and, (3) the police intentionally lied on the affidavit submitted to the court.

■ In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the U.S. Supreme Court established the appropriate standard of review for search warrants:

> [W]e have repeatedly said that after-the-fact scrutiny by the courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' *Spinelli [v. United States],* 393 U.S. [410], 419, 89 S.Ct. [584], 590 [21 L.Ed.2d 637 (1969)]. 'A grudging or negative attitude by reviewing courts toward warrants,' *[United States v.] Ventresca,* 380 U.S. [102], 108,

85 S.Ct. [741], 745, [13 L.Ed.2d 684 (1965)] is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; 'courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common-sense, manner.' *Id.,* at 109, 85 S.Ct., at 746.

462 U.S., at 236, 103 S.Ct., at 2331. With that standard in mind, we will examine the warrants in this case.

To obtain a warrant, the police are required only to show enough evidence to convince the judge (or magistrate) that the police have reason to believe that probable cause exists. The police need not reveal all evidence in the case. However, similar to the requirements of *Brady v. Maryland, supra,* the police may not omit facts from their affidavit that they know tend to diminish probable cause.

The standard for eliminating probable cause on the basis of material omissions does not go to every piece of information in an affidavit. The U.S. Supreme Court described the standard in *Franks v. Delaware:*

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.... There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.... Allegations of negligence or innocent mistake are insufficient.... Finally, [there is no need to invalidate a warrant] if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause.

438 U.S. 154, 171–172, 98 S.Ct. 2674, 2684–2685, 57 L.Ed.2d 667 (1978).

■ The facts in the search warrants that are not attributed to individuals are not those which implicate Mr. Thomas. No one told the police officer that Mr. Thomas committed the murder. The facts which were laid out without attribution were mainly background facts about the mur-

der.[14] Indeed, the only thing actually relied on by the police to tie the defendant to the crime was the F.B.I. psychological profile and the defendant's encounter with Ms. Miller earlier on the evening of her disappearance. Given the totality of the circumstances, that was enough to establish probable cause.

However, two different police officers, working together and relying on the same evidence, each swore that they believed that the murder was committed by a different person.[15] The police would have us believe one of two things: either two officers working together had honest differences of opinion or they were performing some fancy footwork to avoid an obvious false swearing. If the same facts can be used to implicate more than one person in a crime that could have been committed by only one of them, can probable cause be found to exist?

■■■ The U.S. Supreme Court explicitly allowed for such a possibility in *Gates:*

Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' *Spinelli*

[393 U.S. 410] at 419, 83 S.Ct. [584], 590 [21 L.Ed.2d 637 (1969) ].

462 U.S. at 235, 103 S.Ct. 2317, 2330 (1983). Because there should be no "numerically precise" probability, it is possible to have probable cause based on the same facts to search more than one person.

■■■ The standard for evaluating probable cause is a "totality-of-the-circumstances" test. *Id.,* at 230, 103 S.Ct. at 2328.[16] The circumstances in this case apparently are: Janet Miller last was seen alive at the Player's Club. Her body was found at the Sundowner Drive–In, apparently transported there from another location. Ms. Miller was seen having a fight with Jeffrey Mosier at the Player's Club the evening of her disappearance. Ms. Miller was also seen in the company of defendant that evening. Defendant was seen leaving the bar shortly after Ms. Miller. Both defendant and Mr. Mosier fit the F.B.I. psychological profile of the suspect. Given these circumstances, we find that a reasonable magistrate could find probable cause to authorize a search of defendant and Mr. Mosier.

Finally, defendant asserts that the police intentionally lied to the magistrate in the affidavit supporting the search warrant. Det. Waybright attested that Jennifer Moorehead had been physically abused by Mr. Thomas. Det. Waybright used that evidence to fit Mr. Thomas into the F.B.I. psychological profile. There is no dispute that the information cited was in fact false. The claim of a "miscommunication" be-

---

**14.** For example, defendant cites the following as a material omission:

The affidavit of Officer Waybright also stated that it was learned "through investigation" that Janet S. Miller had come to Parkersburg. Although he knew that this information could be supported by statements given to himself and other police officers, by Ms. Miller's parents, brother and people at the Uptowner Inn, the officer chose not to include the source of the information in his affidavit.

Appellant's Brief at 14. This information is just background; it can hardly be considered material to a determination of probable cause. Investigation of what "through investigation" entails would not have aided the judge in determining whether probable cause was present.

**15.** In his affidavit, Detective G.A. Waybright stated, "[y]our affiant has reason to believe and

*does believe* that Marvin John Thomas was involved in the abduction, assault and subsequent murder of Janet S. Miller. [Emphasis added]"

In an affidavit sworn in front of the same judge at approximately the same time, a different officer, Detective J.M. Spellacy swore in his affidavit, *"[y]our affiant believes* and has cause to believe that the crime of first degree murder of Janet S. Miller was committed by one Jeffrey L. Mosier. [Emphasis added]" *See* Appendices A and B for full text of the warrants.

**16.** We have previously adopted the *Gates* "totality-of-the-circumstances" standard. *See* Syl. Pt. 4, *State v. Adkins,* 176 W.Va. 613, 346 S.E.2d 762 (1986). *See also, State v. Hlavacek,* 185 W.Va. 371, 407 S.E.2d 375 (1989); *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706, *cert. denied* 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988).

tween officers shows sloppy police work at best, and leaves an impression of untrustworthiness. However, the standard to be applied is again the *Franks* standard of determining whether probable cause existed without the false evidence. Even excluding the false allegation that defendant abused Ms. Moorehead, the warrant nevertheless contains sufficient information to establish probable cause.

At several places in the record, the red flags of questionable police conduct in handling this investigation have been raised. We are concerned about the appearance of impropriety on the part of the police. The "miscommunication" about Ms. Moorehead is hardly an isolated incident in this case. Another instance of questionable police conduct is the mysterious appearance of the bloodstain and solitary hair in Mr. Thomas' automobile after the F.B.I. returned the car to the Parkersburg police.[17] In any reasonable mind, a serious question of how that stain and single hair came to be found in the car is raised. One can draw only two inferences: the Parkersburg police were not doing their job before the first trip to the F.B.I. lab *and* the F.B.I. did not do its job properly during the first examination of the car, or else the evidence was placed in the car between the first and second F.B.I. examination of the car. Neither option is particularly comforting, but the possibility of the latter is very real and raises doubts about the credibility of the evidence and the police.

A further example of police indiscretion is the participation in the investigation by Det. Spellacy. Det. Spellacy is engaged to the sister of Nancy Chipps, a material witness and good friend of Mr. Mosier. Ms. Chipps' credibility in no small part weighed in the police's determination to pursue Mr. Thomas instead of Mr. Mosier. Det. Spellacy's participation also leads to an impression of police favoritism and lack of impartiality. Incidents such as these serve to undermine faith in the police and the judicial system, in addition to confidence in the verdict in this case.

## IV.

At the trial, defendant wanted to introduce under Rule 803(2), *W.Va. Rules of Evidence,* evidence that on a previous occasion Mr. Mosier physically beat Ms. Miller. To prove this, the defendant called Fred Baltice to the stand. Mr. Baltice was a friend of Ms. Miller's. The morning after Mr. Mosier hit Ms. Miller and bruised her significantly, she drove from Columbus, Ohio, to Greensburg, Indiana, where Mr. Baltice lived. After driving around Mr. Baltice's house three or four times, Ms. Miller went in and explained that Mr. Mosier had caused the bruises. The judge allowed in Mr. Baltice's testimony that he saw the bruises, but did not allow in the hearsay identification of the cause of the bruises because Ms. Miller's statement on this subject was not an "excited utterance" under Rule 803(2).

 The test for an excited utterance requires, in part, a showing that the utterance was not a description of a past completed act and that the statement was made under circumstances that would exclude the possibility that it was the result of deliberation.[18] In this instance, the long passage of time between incident and recounting, as well as the circling of Mr. Baltice's house, certainly raise enough possibility of deliberation that the circuit court's ruling is not an abuse of discretion.[19]

## V.

For the foregoing reasons, the judgment of the Circuit Court of Wood County is

---

**17.** The hair was admitted into evidence at trial; no error was assigned to this Court about that admission.

**18.** *See State v. Farmer,* 185 W.Va. 232, 406 S.E.2d 458 (1991) (per curiam) for a discussion of the history of the excited utterance exception to the hearsay rule.

**19.** Defendant also alleges three instances of jury misconduct. The trial judge held a hearing on the matter and determined that no significant misconduct had occurred. We find no reason to disturb that decision.

reversed, and this case is remanded for a new trial.

Reversed and Remanded.

## APPENDIX A

### AFFIDAVIT SUPPORTING 12 DECEMBER 1986 SEARCH WARRANT FOR SEIZING MARVIN JOHN THOMAS' CAR*

The foregoing grounds tending to establish probable grounds for the issuance of a search warrant are as follows:

On this the 12th day of December, 1986, came before the Honorable Arthur N. Gustke, Judge of this 4th Judicial Circuit, Detective G. A. Waybright, heretofore known as your affiant.

Your affiant states that he is a police officer in and for the City of Parkersburg, Wood County, West Virginia, and that his duties include the investigation of crimes. Your affiant further states that he is investigating the disappearance and subsequent murder of Janet S. Miller that occurred on or about the 28th day of November, 1986. This investigation was initiated by a complaint/report filed with the Parkersburg Police Department by one Pat Honaker, who is the desk manager of the Uptowner Inn, located in Parkersburg, Wood County, West Virginia. This initial report indicates that a white female, who identified herself as Janet S. Miller checked into the Uptowner Inn on Friday, the 28th day of November, 1986, and was assigned to Room # 215. A short time subsequent to checking in to the Uptowner Inn Janet S. Miller was seen leaving the hotel grounds after first placing her clothing and toilet articles and a large purse inside of Room # 215. Her leaving was observed by various members of the staff of the Uptowner Inn. At no time following this did Janet S. Miller ever return to the hotel. Housekeeping staff for the Uptowner Inn became alarmed when Janet Miller did not return for her

personal effects and then notified the Parkersburg Police Department on Sunday, November 30, 1986. Also on Sunday, the 30th day of November, 1986, a 1986 Chevrolet Z–24 Cavalier automobile, bearing Indiana Registration 69A6876, and having Vehicle Identification Number 1G1JF27W8G7114945, was located on the parking lot of the Olympic Sports World complex, which is located in the 2800 block of Birch Street in Parkersburg, Wood County, West Virginia. This vehicle was discovered by uniformed officers of the Parkersburg Police Department. A vehicle registration inquiry through the National Law Enforcement Tele–Communications System showed that this vehicle was owned by and registered to Janet S. Miller of 410 Hermans Street in Batesville, Indiana. The driver's side door of the vehicle was found to unlocked and Officer L.I. Reed inspected it's interior. Located inside the vehicle were a ladies handbag and coat, which were found to belong to Janet S. Miller. The handbag was taken into the custody of Officer Reed for safekeeping and the handwritten note left in the vehicle advising the owner to contact police headquarters for the return of the purse. Through investigation it was learned that Janet S. Miller had come to Parkersburg, WV, from Greensburg, Indiana, on the afternoon of November 28, 1986, and that between 9 and 10 p.m. on that date had arrived at the Players Club, which is located within the Olympic Sports World complex with the intention of meeting Jeffrey L. Mosier, her fiancee. While in the Players Club, one Marvin John Thomas did purchase at least one drink for Janet S. Miller and other females present in the bar. Moments later Marvin John Thomas approached Nancy Black, a patron of the Players Club, and asked her to dance with him, a request refused by Miss Black. Marvin J. Thomas then proceeded to and asked Janet S. Miller to dance. Upon her ascent, the couple went to the dance floor area of the Players Club and there did dance one dance. This was observed by a number of other patrons

* The text in this Appendix has been reproduced verbatim from the actual affidavit submitted to the Wood County Circuit Court. No misspellings, typographical errors, or syntax errors have been corrected.

within the bar proper. Following this dance, Marvin John Thomas and Janet S. Miller returned to their respective seats at the bar of the Players Club. A short while later, both Marvin John Thomas and Janet S. Miller left the Players Club at approximal times.

On Friday, December 5, 1986, Marvin John Thomas was interviewed at the Parkersburg Police Department Detective Bureau by Detectives G. A. Waybright and J. M. Spellacy at which time Mr. Thomas related the following as his day's activities for Friday, the 28th of November, 1986. During the late morning hours of that date, Marvin John Thomas obtained a 1987 Nissan Pulsar automobile from the Parkersburg Nissan dealership on Murdoch Avenue in the City of Parkersburg. This vehicle was obtained for testdriving purposes and left in it's place was a 1980 Datsun 510 for appraisal as a possible trade-in vehicle. The Nissan Pulsar was returned to the dealership sometime between 7 and 7:30 p.m. on the evening of November 28, 1986. Marvin J. Thomas then spent some time talking to Tim Suder, who is a salesman for Parkersburg Nissan. Mr. Thomas then left the dealership driving his own vehicle, which is a 1980 Datsun 510, blue in color. Marvin John Thomas then proceeded to the Olympic Sports World complex and the Players Lounge. When asked why he chose to go to the Players Club on that date, Mr. Thomas stated that he was going there to meet a friend named Jill Barber. Marvin John Thomas stated that upon his arrival at the Players Club he attempted to locate Ms. Barber but was unable to do so. Investigation has shown that Jill Barber claims to have followed Marvin John Thomas to the Parkersburg Nissan dealership when he went to pick up his own vehicle and returned the test vehicle and then had proceeded to the Players Club with him. It should be noted that in interviewing Tim Suder, the salesman at Parkersburg Nissan, he stated that Mr. Marvin John Thomas had not purchased the vehicle test driven and that the reason for this was that Mr. Thomas's insurance rates were high due to previous motor vehicle accidents

that he had been involved in and also because he had received two traffic citations. During the interview of Marvin John Thomas at police headquarters, Mr. Thomas stated that he had had no contact with law enforcement officials of any type other than in the investigation of these two prior motor vehicle accidents. He stated to Detectives Waybright and Spellacy that at no time had he received any traffic citations. A check of the West Virginia Department of Motor Vehicle files revealed that Mr. Thomas had indeed received two traffic citations for speeding. The conviction dates for both of these citations were in the year of 1985. Marvin John Thomas further stated that he arrived at the Players Club sometime between 9 and 9:30 p.m., stopping only briefly at a reception area in the health club before entering the bar. Marvin John Thomas says that he observed Janet S. Miller entering the bar approximately 15 to 30 minutes after her had arrived there. He states that during this time the bar where he sat near and spoke with Kenny Litton and some friends of Kenny Litton. Mr. Thomas is associated with Mr. Litton through pickup basketball games that they had played together in the Southwood Park area of the City of Parkersburg. Mr. Thomas states that he bought Janet S. Miller and two other female persons in the bar drinks. Mr. Thomas also stated that he had watched Janet S. Miller for quite some time, however, he later stated that he had observed nothing and could recall very little about her appearance. Marvin John Thomas stated that he had asked no other person in the bar to dance with him that night. Nancy Black has stated to Detective J. M. Spellacy that Marvin John Thomas did indeed ask her to dance with him and that she turned him down. Marvin John Thomas further stated that he had observed Janet S. Miller talking with Jeffrey Mosier and that he believed that those two persons were in the bar to meet each other yet he still persisted in asking Janet S. Miller to dance with him. Mr. Thomas states that during the time that he and Janet Miller were dancing they did not speak to each other other than to exchange first names. Marvin John Thom-

as states that he did not notice any physical attributes or articles of clothing that Janet S. Miller was wearing other than to state that she was wearing a white or light colored blouse. Marvin John Thomas states that when he returned from the dance floor that Kenny Litton and other subjects that he had associated with were still in the bar. During investigation and the interview of Kenny Litton, he stated that he never saw Marvin John Thomas leave the bar, associate with anyone else nor dance with anyone. Marvin John Thomas states that a short while after he danced with Janet Miller he went to the bathroom and that when he returned, Janet S. Miller was gone. He stated that he finished his beer and then left the bar. Numerous witnesses have stated that Marvin John Thomas left an almost full beer sitting on the bar when he left. Marvin John Thomas stated that he had approximately six bottles or glasses of beer on the night of November 28, 1986, at the Players Club. Marvin John Thomas states that he went directly home from the bar with only one stop en route. He stated that this occurred when he became ill and added that he was unable to tolerate beer, saying that it always made him sick. This is in direct contradiction to an interview conducted with Jennifer Morehead, who is a former girlfriend of Marvin John Thomas, who states that she has seen him intoxicated to varying degrees on numerous occasions and that on none of these had Marvin John Thomas ever become ill from the effects of the alcohol. Marvin John Thomas stated that when he became ill while en route home on the night of November 28, 1986, he stopped his vehicle along State Route 892 in the vicinity of the Blennerhassett Volunteer Fire Department station. He states that he reached behind his seat and took a blanket, which was located there, placed it on his lap and then vomited onto this blanket. When asked why he did not simply open the door and vomit outside the vehicle, he initially could give no reason for his actions, however, he then did say that this had happened to him on a previous occasion and that he had gotten vomit on the exterior surface of his vehicle, which

to him was distasteful. Marvin John Thomas also stated that he had proceeded to his residence then where both of his parents and also his sister were home during the entirety of Friday evening. This is contradicted by Tim Suder, the salesman at Parkersburg Nissan, who stated that in conversation on the morning of November 29, 1986, with the mother of Marvin John Thomas he had learned that both parents were out of town and in Wheeling during the entire evening of November 28, 1986. Marvin John Thomas stated that upon arrival at his residence, he placed the blanket which he had vomited in into a trash recepticle and he stated that this trash recepticle had since been emptied by a garbage collection service and that the blanket could not be retrieved. Marvin John Thomas then stated that he entered his residence, closed the garage door and proceeded to his room where he again became ill and again vomited. He stated that he was unaware if his parents or sister had heard him while he was ill. Marvin John Thomas then stated that he undressed and went to bed and did not arise until approximately 11 a.m. on the morning of Saturday, November 29, 1986. When questioned in reference to taking a polygraph examination to cooberate the facts that he had given in his statement, Marvin John Thomas showed extreme reluctance. He explained this by stating that on a previous occasion a guest speaker had brought a polygraph into a psychology class in which he was a student. Mr. Thomas stated that he was used as a test subject in this class and that he found the experience extremely distasteful. While he was quite adamant about his distate and dislike of polygraph examinations, he was totally unable to recall any questions that were asked him during this classroom project. Additional background information on Marvin John Thomas was obtained through an interview with Mike Hayden, who was a coach of Marvin John Thomas while he was a student at Parkersburg South High School. Mr. Hayden stated that Marvin John Thomas was extremely aggressive, stating that he would fight tooth and nail to win a victory. Stated he was an extremely clean cut person, but

that he was also very hot tempered and had a short fuse. Mr. Hayden stated that Marvin John Thomas was exttremely aggressive and a fierce competitor. ALso interviewed in reference to the background of Marvin John Thomas was Jennifer Morehead, who, as mentioned above, is a former girlfriend of Marvin John Thomas. She stated that he was extremely aggressive and persistent sexually and that he became greatly disturbed when his advances were turned away by herself. Also during the course of the interview with Marvin John Thomas, he stated that the Players Club was the only bar in which he had been in attendance on the evening of November 28, 1986. It was later learned through an acquaintance of Marvin Thomas, one Sandy Norman, that she had seen Marvin John Thomas at Barley's Bar, located in the 2900 block of Dudley Avenue in the City of Parkersburg on the evening of November 28, 1986. On Wednesday, December 10, 1986, the body of Janet S. Miller was located in an abandoned concession area of the Sundowner Drive Inn Theater, located on Gihon Road in Wood County, West Virginia. Medical examination by the West Virginia State Medical Examiner's office showed that the cause of death was manual strangulation and that additional extensive injuries to the head were caused by blunt trauma through the use of either a fist or heavy object. Additionally the autopsy revealed that Janet S. Miller had sustained a tear in her liver, which had been the result of a heavy blow to her upper abdominal area. The victim had also been sexually molested. Upon examination of the location in which the victim's body was found, it is believed by investigators that the actual assault and murder of Janet S. Miller did not occur at the abandoned Sundowner Theater, but that she was killed elsewhere and her body transported there in a vehicle before being disposed of inside the concession building.

On the morning of Friday, December 12, 1986, Sgt. T. A. Dent of the Parkersburg Police Department contacted the Psychological Evaluation Unit of the Federal Bureau of Investigation, which is located in Quantico, Virginia. Sgt. Dent provided that agency with information collected in reference to this homicide and from this information a psychological profile of the perpetrator was provided. Characteristics given in this profile are as follows: (1) the beating of the victim about the head and face severely indicates that there is a high probability that the victim knew or was acquainted with her assailant, (2) the assailant has deep hatred for women and does not develop long term relationships with them. This person would also tend to use women in order to show his superiority. This is consistent with reports from various sources which indicate that Marvin John Thomas was a "loner", who did not associate well with females. (3) Jennifer Morehead, a recent girlfriend of Marvin John Thomas, bears a close physical resemblance to the victim in this case. Through investigation it had been learned that the relationship between Marvin John Thomas and Jennifer Morehead was ended by Jennifer Morehead. The psychological profile indicates that these facts are very consistent with the aggression shown in the physical assault on the victim in this case. (4) The agressiveness, impulsiveness and hot temper exhibited by Marvin John Thomas and is documented by Michael Hayden is indicative of violent tendancies which would be consistent with the actions surrounding the death of the victim. (5) Marvin John Thomas has been described by associates as a loner with few friends. The psychological profile indicates that a person with few friends of either sex and inability to initiate and maintain friendships is a clear indicator of deep inferiority feelings within that person. (6) Arrogant actions and displays of implied superiority are consistent with the personality of Marvin John Thomas as indicated by acquaintances. (7) These same feelings of inferiority which breed the inability to maintain relationships and also an arrogant attitude also cause a person to develop possessiveness and jealousy as results in this person's giving gifts to other people to prove himself and to help relieve these inferior feelings. This was clearly demonstrated in the buying of drinks for a number of persons within the Players Club

Bar on the evening of November 28, 1986. It should be noted that Psychological Profiles developed by the Behavioral Sciences Section of the Federal Bureau of Investigation have been used by the Parkersburg Police Department in murder cases in the past with successful results. According to Sgt. T. A. Dent, it is the opinion of the Behavioral Science Department professionals that Marvin John Thomas does indeed fit the profile of the murder of Janet S. Miller. Due to association of Marvin John Thomas with Janet S. Miller in the Players Club, the discrepancies in his statements given to Detective Bureau personnel in the investigation of this crime and the similarities between personalities of Marvin John Thomas and that of the murderer indicated in the Federal Bureau of Investigations Psychological Profile, your affiant has reason to believe and does believe that Marvin John Thomas was involved in the abduction, assault and subsequent murder of Janet S. Miller and that following her murder the body was transported in a vehicle driven by, operated by Marvin John Thomas to the Sundowner Drive Inn where the victim's body and articles of clothing were discarded. Your affiant further believes that latent fingerprints, serological evidence, hair, fibers and other evidence in this crime can be located within a vehicle operated by Marvin John Thomas. The vehicle driven by Marvin John Thomas on November 28, 1986, has been offered as a trade in vehicle for a new automobile and may be discarded by Marvin John Thomas at any time. The vehicle to be searched is more precisely described as a 1980 Datsun, Model 510, four door hatchback. This vehicle is blue in color and bears West Virginia Registration 1P1675 and Vehicle Identification Number FHLA100005835.

Also on December 12, 1986, a green blanket, similiar in description to that described by Marvin John Thomas and into which he states he vomited, was located at the Sundowner Drive Inn. This blanket bore what appeared to be human vomit and some other fluid.

For these reasons your affiant respectfully requests the issuance of a search warrant for the above described vehicle.

/s/Detective G. A. Waybright
AFFIANT

Taken, subscribed and sworn to before me this 12th day of December, 1986.

/s/Arthur N. Gustke
Circuit Court Judge, Wood County,
West Virginia

## APPENDIX B

AFFIDAVIT SUPPORTING 12 DECEMBER 1986 SEARCH WARRANT FOR SEIZING JEFFREY L. MOSIER'S CAR *

The foregoing facts tending to establish probable cause for the issuance of a search warrant are as follows.

On this 12th day of December, 1986, came forth before Judge Arthur N. Gustke, Detective J. Michael Spellacy, heretofore known as your affiant.

Your affiant states that he is a police officer in and for the City of Parkersburg, Wood County, WV. Your affiant further states that part of his duties as a police officer are to investigate crime. Your affiant states that he is currently investigating the crime of murder, the murder of one Janet S. Miller, a white female, age 22. The circumstances surrounding the murder are as follows.

Miss Miller was a resident of Greensburg, Indiana, and had been engaged to one Jeffrey L. Mosier, formerly of Greensburg, Indiana, and currently residing at 405D Lakeview Estates, Parkersburg, Wood County, West Virginia. On November 28, 1986, Janet Miller arrived in Parkersburg, Wood County, WV, in the late afternoon hours and checked into the Up-Towner Inn in Parkersburg and later on in the evening hours of 11/28/86 at approximately 9:00 p.m. to 10:00 p.m. arrived at

---

* The text in this appendix has been reproduced verbatim from the actual affidavit submitted to the Wood County Circuit Court. No mis- spellings, typographical errors, or syntax errors have been corrected.

the Players Bar, located at Olympic Sports World in Parkersburg, Wood County, West Virginia, and there met with her fiancee, Jeffrey L. Mosier. According to witnesses, an argument ensued between the two and eventually she left the bar and was not seen or heard of until December 10, 1986, when her body was discovered at an abandoned drive in theater on Gihon Road known as the Sundowner Drive Inn. At the time Janet Miller left the Players Bar on November 28, 1986, she left her vehicle, a 1986 Chevrolet Z–24 on the parking lot of Olympic Sports World with the driver's door unlocked and her purse and coat inside the car. Inside the purse was cash along with car keys and other personal items. Miss Miller's body was found inside the concession stand at the Sundowner Drive Inn. The clothing that she had on at the time was a black skirt and white blouse. The skirt had been pulled up on her legs and the blouse had been pulled up on her chest, along with the bra, which was pulled up on the chest. Two other articles of clothing believed to be Miss Millers, that being a satin type jacket along with a part of black panty hose were found inside the concession stand near the body. The Medical Examiner's report was that the cause of death was manual strangulation, however, she had a fractured skull, a broken jaw and a ruptured liver. Also she had been sexually molested. Investigation at the scene where the body was found indicated that none of the crimes committed against Miss Janet Miller occurred at the Sundowner Drive Inn Theater, indicating that there was in fact another crime scene where she was abducted and later beaten, raped and murdered. The investigation also revealed that she was therefore moved from that crime scene by a motor vehicle to the Sundowner Drive Inn, located on Gihon Road, Parkersburg, Wood County, West Virginia, where the body and clothing were dumped. Further facts in reference to the case are that her fiancee, Jeffrey L. Mosier of 405D Lakeview Estates, Parkersburg, Wood County West Virginia, arrived in Parkersburg approximately four months ago where he went to work for Wendys, located on Gihon Road on Southside of Parkersburg, Wood County, West Virginia. When Mosier arrived in Parkersburg, the victim, Janet S. Miller, came to Parkersburg on at least one other occasion prior to November 28, 1986, and she was explained to friends of Mosier that he had made in Parkersburg that she was only a friend and nothing more when in fact the investigation revealed that Janet S. Mosier was in fact his fiancee. Your affiant further states that during the time since Mosier arrived in Parkersburg he has dated at least three girls in the Parkersburg area. Also when the victim arrived on 11/28/86 and checked into the Uptowner Inn, housekeeping later on on Sunday, 11/30/86, discovered that the room had not been used save for leaving a large purse and clothing in the room which was later identified by the victim's mother as belonging to the victim and that on 11/28/86 Jeffrey L. Mosier was in the Players Bar at the Olympic Sports World in the company of other people, one of which was his current girlfriend in Parkersburg, Wood County, West Virginia, Janet Norman, and that the victim, Janet S. Miller, arrived there at approximately the same time as did Jeffrey L. Mosier. Investigation revealed from witnesses that Mosier was angry that she came and that while she was in the bar Mosier had at least a disagreement with her. Investigation also revealed that the victim, Janet S. Miller, according to her mother, came to Parkersburg to break off the engagement between Janet Miller and Jeffrey L. Mosier. Also investigation revealed that Mosier stated himself that Janet Miller was merely running after him when she came to town and that he had no knowledge of her coming into town on 11/28/86. Also while the victim was in the Players Bar on 11/28/86 she appeared to ignore Mosier after they had their disagreement and received some attention from another male that was in the bar and that this male bought her at least one drink and possibly two and then asked her to dance which she did do and that Jeffrey L. Mosier did observe all of this and that Mosier stated to the police that he went to the restroom about the time Janet Miller was dancing and when

Mosier returned from the restroom to his friends, that being a group of four females, one of which his current girlfriend, Janet Norman, he asked them where Janet Miller had went to and according to those friends, they had the impression that Mosier assumed that she had left with the other male that had given her the attention and that she had danced with. Also that Mosier was asked to go to another bar with his current girlfriend, Janet Norman, and the other three girls and that Mosier stated that he was not going to go and that he was going to stay at Players and finish his beer and go home. Also that Mosier originally stated to Detective G. A. Waybright in an interview on Monday, 12/01/86, that he went straight home from the Players Bar between 11:00 p.m. and 11:15 p.m. and that he caught a ride with Jan Norman and the other girls. Mosier also told Detective G. A. Waybright that he returned to the Olympic Sports World parking lot on 11/29/86 between 0500 and 0530 hours and wrote out a note to the victim, Janet S. Miller, and left it in the car on the dashboard. That note, verbatim, said, "I knew you'd do this. It's 5:30 a.m. and I'm going to work. How about you! Ha. Hope it was good and you didn't catch anything. You are a bitch just like the rest." Jeffrey Mosier told G. A. Waybright that he had left this note inside Janet Miller's vehicle which was parked on the lot while on his way to work at Wendys in Athens, Ohio, where he had recently taken over as manager, and that he went to work at 7 a.m. in the morning at Wendys in Athens and worked until 5 p.m. on 11/29/86. When he got off work, he returned to the Olympic Sports World and observed that the victim's automobile was still parked in the same place. According to the bar owner, Mr. Jim Brundige, Mr. Mosier came in on 11/29/86 in the late afternoon or evening hours and apologized that the car was still there and that he hoped that it did not make Mr. Brundige feel badly about him. He felt responsible for the car being there. Further, that on 11/30/86 investigation revealed Mr. Mosier called the Uptowner Inn and identified himself to the desk clerk and told the desk clerk that he was the fiancee of Janet S. Miller and wanted to know what time she had checked in the Uptowner Inn on Friday, 11/28/86. He further went into an explanation that Janet Miller had made arrangments with him earlier in the week to come to town and to meet with him at Players Bar, located at the Olympic Sports World and that she did in fact come there on Friday, 11/28/86, presumably after checking in at the Uptowner Inn and that she was very angry with him because he had not called her the previous week. He further explained to the desk clerk that while in the bar, Janet Miller had danced with another male and that it had made him very angry and also that he had called Janet S. Miller's parents in Greensburg, Indiana, to see if she was there and discovered that she was not. It was also discovered in the investigation that the parents were never notified by Mr. Mosier or questioned by Mr. Mosier in reference to Miss Miller's disappearance. The investigation revealed that after this point in time Mr. Mosier began having mood swings and drinking very heavily. On or about Sunday, November 30, 1986, Mr. Mosier was confronted by his present girlfriend, Janet Norman, with the fact that he was engaged to the victim, Janet S. Miller, and at that time he explained to Janet Norman that he had been engaged to her but had broken the engagement off prior to coming to Parkersburg four months ago. The investigation also revealed that the week following the disappearance Mosier asked out on dates at least two other girls, who declined to go out with him. On 12/02/86 Mr. Mosier called his ex-wife in Indiana and told her that the victim, Janet Miller, was dead. Then he also told her that she had committed suicide and that it was all his ex-wife's fault. The investigation revealed that the ex-wife has had no contact with the victim, Janet S. Miller. The Medical Examiner's report from the autopsy on the body of Janet S. Miller reflected that the beating that Janet Miller received could be consistent with a left handed attacker and the investigation also revealed that Jeffrey L. Mosier is left handed. The investigation also revealed that on 12/10/86 Jeffrey L.

Mosier came to the Parkersburg Police Department and advised Detective J. K. Smith he knew the victim had been beaten and found at a drive-in theater in Parkersburg. Investigation also revealed on 12/10/86 Mosier had been at work in Athens, Ohio, on this particular day and prior to getting off, he was advised by the assistant manager, who had received information from a local news station, that a body was found and that the coroner had said that the body was that of Janet Miller. Mosier asked the assistant manager if the police had said how she was killed and who had done it and the assistant manager told him that police wouldn't say anything more. Mosier was interviewed by Detective J. K. Smith when he came to the police department on 12/10/86 and during the course of the interview Mr. Mosier was caught in several lies compared to his first story he had told Detective G. A. Waybright. Number one was that he had in fact went to the victim's vehicle prior to leaving the Players Club on 11/28/86. Number two is he first told Detective J. K. Smith that he wrote the note that he left in the vehicle at his residence on 11/29/86 prior to going back to the victim's car on his way to work. He then changed his story and stated he wrote the note at the time he went to the vehicle on 11/29/86 at 5 a.m. He also told Detective J. K. Smith that he entered the vehicle by the passenger door, which was unlocked the put the note on the passenger side of the dashboard and left the door unlocked and went on to work. Investigation revealed that Jan Norman and a friend, Nancy Chipps, had went to the victim's vehicle on 11/30/86 and found the note on the driver's side of the dashboard and the passenger door locked however, the driver's door was unlocked. Mosier also told Detective J. K. Smith that a man as little and skinny as he was couldn't possibly have done what was done to the victim. Investigation revealed, however, that Mosier works out regularly at Olympic Sports World with Nautilus equipment and weights. At the beginning of the interview, Mosier said he was not angry that the victim was receiving attention from another man, but later on in the interview he admitted that he was very angry about the victim receiving attention from another man. Mosier had originally stated that he had left the Players Bar on 11/28/86 between 11 p.m. and 11:15 p.m. in the company of Janet Norman and three other girls who took him home. During the interview with Detective J. K. Smith he told Detective J. K. Smith that he had left Players at 11:45 p.m. and driven his own car home and then called a girlfriend by the name of Sandy Jackson shortly after midnight and then stayed home the rest of the night until he left for work and went to the victim's car at approximately 5 a.m. on 11/29/86. That vehicle being a 1981 Chevrolet El Camino, bearing Indiana Registration 14556T. The vehicle identification number is 1GCCW80K7BD411094, two tone in color, gold on the top with a large white panel around it and gold on the rocker panels. Also has chrome beauty rings on the wheels. Mosier also told Detective J. K. Smith that he was only married once and had one ex-wife, which was consistent with the story that he told all his friends in the Parkersburg area. The investigation, however, revealed that he had been married twice and had two ex-wives. The investigation also revealed that at the site inside the concession stand where the body of the victim, Janet Miller, was found near the body was a quart bottle of lite beer. Also at the time that Jeffrey L. Mosier came to the police department on 12/10/86 the police observed in plain view inside the Chevrolet El Camino a quart bottle of lite beer. Also during the interview with Detective J. K. Smith Jeffrey Mosier maintained that he went straight home on 11/28/86 after leaving the Players Bar. Investigation revealed an independent witness saw him in a local bar, namely Masters, located on 5th Street in Parkersburg, Wood County, WV, on 11/29/86 in the very early morning hours, approximately 2 a.m. to 2:30 a.m. Also on 12/12/86 Sgt. T. A. Dent of the Parkersburg Police Department contacted the Behavioral Science Department of the Federal Bureau of Investigation at Quantico, Virginia, in an attempt to get a psychological profile of the murderer. It should

be noted that the Behavioral Science Department of the F.B.I. has successfully been used to profile murderers by the Parkersburg Police Department in the past and that Sgt. T. A. Dent related the facts and circumstances surrounding the murder of Janet S. Miller to the Behavioral Science Department. The Behavioral Science Department's professional opinion was that Jeffrey Mosier did in fact fit the psychological profile of the murderer of Janet S. Miller. A portion of the psychological profile and characteristics are set forth here in that (1) beating about the victim's head and face is indicative of a high probability that the victim knew her assailant, (2) the assailant would have deep hatred for women and doesn't have long lasting relationships with women and the assailant uses them to show superiority. This is the first two characteristics being supported by Mr. Mosier's relationship with numerous women and his divorces also supported by the note which he wrote and left in the victim's vehicle. Characteristic # 3, the assailant would become more aggressive on a particular date or near that date in the year that some significant loss occurred to him. This is supported by the fact that Mr. Mosier's mother died at Christmas time between Thanksgiving and Christmas, and that the investigation revealed that this particular time of the year Mr. Mosier was deeply depressed because of the loss of his mother and has also been depressed previous years during that time period and is also an indicator that the assailant would be transferring his hatred for the loss and blame of that loss to the victim. Characteristic # 4, hot temper, compulsiveness, compelling in complete actions and inability to complete assignments is an indicator of violent tendacies. This is supported by investigation that Mr. Mosier is very impulsive and is a heavy user of alcohol, drinking at least five nights and days out of the week, coupled with the fact that Mr. Mosier has recently been fired at Wendys in Athens, Ohio. Characteristic # 5, assailant would have few true friends of either sex and have an inability to initiate and maintain lasting friendships, which is indicative of deep inferiority feelings. Investigation reveals that Mr. Mosier does in fact have very few close friends of either sex and seems to jump from one relationship to another with women. Characteristic # 6, arrogant actions and displaying of implied superiority are consistant with the assailant. This is supported by investigating officers personal observations of Mr. Mosier when he has been interviewed. It is also supported by the personal observations of independent associates of Mr. Mosier, both at work and at the Olympic Sports World. Your affiant further states that on 12/10/86 when Mr. Jeffrey Mosier came to the Parkersburg Police Department of his own free will and accord he was voluntarily given a polygraph examination after being mirandized. The questions that were asked during the examination were, Did you cause Janet Miller's death? Response was no. Question, did you slap Janet Miller? Response no. Question, were you at the Sundowner Drive Inn? The response no. Question, did you go to Janet Miller's car that evening when you left Players? Response no. The examination conducted by West Virginia Assistant State Fire Marshal L.D. Huggins revealed deception on all of the above questions. For these reasons your affiant believes and has cause to believe that the crime of first degree murder of Janet S. Miller was committed by one Jeffrey L. Mosier on or about November 28, 1986 and that the person or body of Janet S. Miller was placed inside the vehicle belonging to Jeffrey L. Mosier and transported to an unknown location where the crime of malicious assault, first degree sexual assault and first degree murder were committed against Janet S. Miller and that the body of Janet S. Miller was then transported in that same vehicle to the location that she was found on December 10, 1986, that being the concession of the Sundowner Drive Inn, located on Gihon Road in Parkersburg, Wood County, WV. and further that the vehicle in question belonging to Jeffrey L. Mosier has Indiana Registration on it at

this current time and that Jeffrey L. Mosier no longer has any employment in the Ohio Valley and that Jeffrey L. Mosier is cognizant of the fact that he is now a suspect in the crime of first degree murder, gives cause for your affiant to believe that Jeffrey L. Mosier may take the said vehicle and flee the State of West Virginia. Further, for these reasons your affiant does believe that the said vehicle, namely a 1981 Chevrolet El Camino automobile, bearing Indiana Registration 14556T, vehicle identification number 1GCCW80K7BD411094, two tone, gold and white in color, gold on the top, white in the middle and gold on the bottom with chrome beauty rings, is an instrument of the crime of first degree murder and first degree sexual assault and does contain in it certain evidence of the crimes of first degree murder and first degree sexual assault, namely fingerprints of the victim, footprints of the victim, blood of the victim, semen of the suspect, hair of the victim and fibers from the victim's clothing and other evidence of the crime of first degree murder and first degree sexual assault.

For these reasons your affiant respectfully requests the issuance of a search warrant for the aforementioned vehicle.

/s/J. M. Spellacy
Affiant

Taken, subscribed and sworn to before me this 12th day of December, 1986.

/s/Arthur N. Gustke
Circuit Court Judge, Wood County, West Virginia

JMS/db–5