412 S.E.2d 762

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Stewart Martin ELLIOTT, Defendant Below, Appellant.**

**No. 20128.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 1991.

Decided Dec. 13, 1991.

due to our conclusion that the jury's verdict of no liability should not be disturbed.

Teresa A. Tarr, Asst. Atty. Gen., Charleston, for appellee.

Francis M. Curnutte, III, Madison, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Stewart Martin Elliott from the November 13, 1990, final order of the Circuit Court of Lincoln County which denied the appellant's motion for a new trial. The appellant was tried and convicted by a jury on June 6, 1990, of first degree felony murder, sexual assault in the first degree, arson in the fourth degree and two counts of attempted murder. The appellant maintains that the following errors were committed by the trial court: 1) the trial court erred in permitting the jury to convict the appellant of both felony murder and the underlying felonies; 2) the trial court erred in instructing the jury on felony murder; 3) the trial court erred in instructing the jury on arson; 4) the trial court erred in instructing the jury on attempted murder; and, 5) the trial court abused its discretion by not declaring a mistrial *sua sponte* as a matter of manifest necessity. Since the trial court erred in convicting and sentencing the appellant on the underlying felony which supported the felony murder conviction, we reverse on this error only and remand for entry of an order to comport with this opinion. The convictions are otherwise affirmed.

On September 29, 1989, the appellant met Karen Lynn Ball, Michael Lacey and Freddie Miller between 10:30 and 11:00 p.m. Ms. Ball testified that the appellant had been drinking heavily and that he had asked her to go with him to his mother's home so that they could engage in sex. When Ms. Ball refused, the appellant began cursing her.[1]

The appellant proceeded on to his mother's former home in West Hamlin, West Virginia, along with Lacey and Miller, according to the testimony of Michael Lacey. There the three consumed more alcohol before going to a bar where the appellant purchased more beer and cigarette papers. The appellant then rolled a joint and smoked it. Next, Lacey and the appellant went to the Double D Motel to visit Debra Berry.

Upon walking back to the bar, Lacey and the appellant came upon a motorhome where they met Ray Dotson. Lacey testified that the appellant went up to the motorhome and knocked on the door. Both the appellant and Dotson spoke for a while, before Lacey and Miller joined them. Lacey then testified that they asked him if he wanted to go riding around with them. When he agreed, "they [Dotson and the appellant] started it up and they was talking about going to get some pussy or something like that."

The appellant testified that Dotson wanted some pills, so the appellant directed him to Annette Abraham's and Nancy Walton's home. The appellant testified that Ms. Abraham was a good friend and that he had partied before with her and knew that she had pills. Additionally, the appellant's testimony indicated that he had previously dated Nancy Walton.

---

1. Ms. Ball also testified that the appellant had asked her to have sex with him a week prior to this incident. When she refused, the appellant grabbed her around the throat with one hand. Ms. Ball's testimony indicated that when she told him to stop, he did pull away from her.

When they arrived at Ms. Abraham's home, only the appellant and Dotson exited the motorhome. The other passengers remained in the vehicle.[2] The appellant and Dotson remained in Ms. Abraham's home for approximately forty minutes, according to Lacey's testimony. During this forty-minute period, Annette Abraham was killed. The medical examiner's testimony revealed that the victim received seven blows to the head, face and scalp from being struck with a blunt object, which was determined to be a marble rolling pin.

Moreover, Maria Darby, Annette Abraham's ten-year-old daughter, was also attacked and raped. Maria testified that she was awakened by someone shaking her. Her testimony then indicated that both Dotson and the appellant raped her before placing a belt around her eyes and hitting her in the head with something. Maria positively identified the appellant when she saw him in the light given off from a cigarette lighter and when she heard his voice. Maria's testimony further revealed that two-year-old Christina Walton was lying in the bed next to her when she was assaulted, but she was not harmed. Finally, Maria testified that she heard the appellant state that he wanted rings and that " '[w]e're going to burn the house,' " and that "when they was hitting me in the head, Elliott [the appellant] called Dotson and said, told him, said, 'she ain't dead.' "

The appellant testified that after leaving Ms. Abraham's home, the two returned to the motorhome and drove to Hamlin, West Virginia. The appellant and Dotson then went to the Lower Mud River, where the appellant testified that he passed out in the vehicle. According to the appellant, when he came to, Dotson took him to Amanda Salmon's house where he showered and had Patricia Salmon do his laundry. The appellant left behind at Ms. Salmon's residence a brown paper bag containing jewelry, a medic alert tag belonging to Annette Abraham and four or five packs of Doral cigarettes, which was the brand smoked by

the victim. Patricia Salmon testified that the appellant did come alone to her house the morning of September 30, 1989, around 9:00 to 9:30 a.m. Her testimony indicated that she did his laundry, but did not notice anything unusual about his condition or appearance. Further, she did not notice any blood on the appellant or his clothing.

When Louis Abraham went to his daughter's home on September 30, 1989, he found her lying dead in the front room. He also felt heat from the kitchen. When he walked into the kitchen, he discovered all four burners of the stove were lit. Mr. Abraham's testimony also revealed that some type of paper had been piled on the burners.

Shortly thereafter, Trooper C.B. Alford of the West Virginia State Police arrived at the scene. He, too, found ashes on the kitchen stove. He also found blood all over the bedsheets, pillow and headboard and a puddle of blood on the floor. Trooper Alford also discovered a marble rolling pin lying under the rug and two marijuana cigarette roaches and a burn on the bed. Finally, the trooper testified that he found a pack of Doral cigarettes lying on the nightstand and an empty carton in the trash can in the bedroom.

Trooper H.B. Myers, who conducted the serological tests on the items found at the victims' home, testified that the blood on the bedsheets, pillow and rolling pin was consistent with Ms. Abraham's and Maria's blood. The blood found on a towel, rug, sham and shirt worn by Ms. Abraham was consistent with Ms. Abraham's, Maria's and the appellant's blood type. Further, blood and sputum found on the Doral cigarettes and marijuana cigarettes were consistent with Ms. Abraham's, Maria's and the appellant's blood type.[3]

The appellant's defense consisted of his own testimony in which he acknowledged that he saw Ms. Abraham's murder and the sexual assault of Maria, but denied actively participating in either crime. The appellant

2. The other passengers, according to the testimony at trial, were Lacey, Miller, Eddie Adkins and another unidentified person.

3. None of the blood or sputum discovered at the crime scene was found to be consistent with Dotson's blood type.

testified that Dotson committed both crimes. His testimony also indicated that Dotson made the statement that he was going to burn down the house. The appellant testified that Dotson repeatedly threatened to kill him if he went to the police. Finally, the appellant testified that Dotson gave him the jewelry which was identified as belonging to the victim, in return for him giving Dotson money for gas.

During the trial, upon completion of the testimony of Pearl Abraham, the mother of Annette Abraham, the witness pulled out a handgun and shot at the appellant. The court immediately adjourned the proceedings until the next day. When the trial resumed, the court, in camera, stated to the appellant that a mistrial would be declared if the appellant so desired. The appellant's counsel indicated in the record that:

> It is Mr. Elliott's desire to continue. We have discussed the posture that the case is in right now and the advantages and disadvantages of having another trial with a totally separate jury at another term of court or continuing with this trial.

> Mr. Elliott feels that it is in his best interest and goes along with his desire to expedite this matter, to have this trial continue. So we are prepared to continue the trial at this time....

The trial court then conducted an individual voir dire of each juror to ascertain whether the shooting incident had prejudiced them against the defendant. Each juror indicated that he could decide the case solely on the evidence presented to him. Thus, the trial continued, and the jury ultimately found the appellant guilty of the crimes charged.

## I.

The first issue before the Court is whether the trial court erred in permitting the jury to convict the appellant of both felony murder and the underlying felony of fourth degree arson. The appellant contends that a conviction of both first degree murder

based on the felony murder theory and the underlying felony of fourth degree arson violates the double jeopardy clause of the United States Constitution and article 3, section 5 of the West Virginia Constitution. The state concedes that the trial court erred in convicting and sentencing the appellant on the underlying crime of arson which supported the felony murder conviction.

■ This Court has previously held in syllabus point 8 of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983) that "[d]ouble jeopardy prohibits an accused charged with felony-murder, as defined by W.Va.Code § 61–2–1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony." *Accord* Syl. Pt. 10, *State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991); Syl. Pt. 8, *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990).

It is evident from the jury verdict form in this case that the jury convicted the appellant of first degree felony murder and the underlying felony of arson in the fourth degree, and that the court sentenced him on both. Consequently, under the principles set forth in *Williams* and its progeny, both the conviction and sentence pertaining to fourth degree arson constitute a violation of double jeopardy. We therefore reverse the appellant's conviction for fourth degree arson and remand this case for entry of an order comporting herewith.

## II.

Another issue which requires discussion is whether the trial court erred in convicting and sentencing the appellant for the underlying felony of first degree sexual assault which also supported the felony murder conviction.[4] This issue presents a question of whether double jeopardy principles are violated when a defendant is convicted of two underlying felonies and felo-

---

**4.** It is clear that the jury could have based their first degree felony murder conviction upon either the arson charge or the sexual assault charge as the underlying felony. The jury was not asked to identify which felony they used as the basis for the felony murder conviction.

ny murder, where one of the underlying felonies which could have supported the felony murder conviction involved a separate and distinct victim from the actual felony murder victim.

■ Previously this Court held that "[w]hen a defendant commits two separate aggravated robberies, and in the course thereof kills one of the victims, he can be convicted of both the aggravated robbery of one victim and the felony murder of the other." Syllabus, *State ex rel. Lehman v. Strickler*, 174 W.Va. 809, 329 S.E.2d 882 (1985). Of particular significance to this case is that also in *Lehman*, we stated that " '[w]hen a crime is committed against people rather than property, the general rule is that there are as many offenses as there are individuals involved.' " 329 S.E.2d at 884 (quoting *State v. Myers*, 171 W.Va. 277, 279, 298 S.E.2d 813, 815 (1982)).

The reason so much importance is given to the number of victims in determining whether double jeopardy principles are violated was discussed in *State ex rel. Watson v. Ferguson*, 166 W.Va. 337, 274 S.E.2d 440 (1980). In *Watson*, this Court reasoned:

We do not conceive that in fashioning a double jeopardy policy in regard to what is the 'same offense' that we can ignore the fact that multiple victims have been subject of the defendant's acts. There can be little doubt that one function of a criminal justice system is to enable those individuals who have been victimized by the criminal acts of another to find some individual vindication of the harm done to each. Certainly, the degree of culpability, and as a consequence the degree of punishment, must bear some proportion not only to the magnitude of the crime but also to the number of victims involved. These are fundamental considerations that society expects from a criminal justice system.

166 W.Va. at 348, 274 S.E.2d at 446.

■ In the present case, the arson charge also served as the basis for the first degree felony murder conviction. Thus, we will not set aside the conviction for the first degree sexual assault of the ten-year-old daughter of the murder victim, since the sexual assault involved a separate and distinct victim.

Other jurisdictions have held that where "the underlying felony charged in one count of the indictment is committed upon one victim and the malice or felony murder charged in another count of the indictment is committed upon another person, ... the underlying felony does not merge with the felony murder conviction." *Satterfield v. State*, 248 Ga. 538, 541, 285 S.E.2d 3, 5 (1981); *see also Stitt v. State*, 256 Ga. 155, 157, 345 S.E.2d 578, 580 (1986); *see generally Clay v. State*, 593 P.2d 509 (Okla. Crim.App.1979); *O'Briant v. State*, 556 S.W.2d 333 (Tex.Crim.App.1977). Thus, double jeopardy principles are violated only when the defendant is convicted for both felony murder and the underlying felony where there is only a single victim.

The appellant relies heavily upon our decision in the *Williams* case where it was impossible for this Court to determine whether the jury had used arson or robbery as the underlying felony which supported the defendant's first degree felony murder conviction. 172 W.Va. at 312, 305 S.E.2d at 268. The trial court in *Williams* sentenced the defendant for felony murder, arson and robbery. *Id.* 172 W.Va. at 310, 305 S.E.2d at 266. There we stated that "[t]o secure the protections afforded the appellant by our double jeopardy laws, we reverse the sentences for both the arson and robbery convictions and remand the case for resentencing." *Id.* 172 W.Va. at 312, 305 S.E.2d at 268.

■ The distinguishing factor between the *Williams* case and the present case, however, is that in *Williams* there was only one victim involved. Thus, we hold that where there is more than one underlying felony supporting a felony murder conviction and one of the underlying felonies is committed upon a separate and distinct victim from the victim who was actually murdered, that underlying felony conviction does not merge with the felony murder

conviction for the purposes of double jeopardy.

### III.

The appellant's other assignments of error may be summarily dismissed. After a review of the record we find no merit to his claims that the trial court erred in instructing the jury on felony murder [5], arson and attempted murder, due to insufficient evidence presented to the jury. *See* Syl. Pt. 3, *State v. Taylor*, 175 W.Va. 685, 337 S.E.2d 923 (1985).

Similarly, we find that the appellant's claim that the trial court abused its discretion by not declaring a mistrial *sua sponte* as a matter of manifest necessity after the murder victim's mother fired a handgun at the appellant from the witness stand is totally unsupported by the record. The record reflects that the trial court was willing to grant a mistrial upon the appellant's request. The appellant, after consulting with his counsel, decided to continue on with the trial. Finally, the trial court conducted an individual voir dire of the jury panel to ensure that the jurors had not been prejudiced by the incident.

Based upon the foregoing opinion, the decision of the Circuit Court of Lincoln County is hereby reversed and remanded for resentencing.

Reversed and Remanded in part; Affirmed in part.

---

5. Regarding the appellant's argument that the trial court erred in instructing the jury on felony murder, the appellant asserts that the evidence presented at trial suggested that Annette Abraham was killed prior to the commission of the sexual assault and attempted arson. Upon a review of the record, we conclude that there was sufficient evidence presented to the jury which enabled them to conclude that "[m]urder ... in the commission of, or attempt to commit, arson, sexual assault, robbery or burglary ..." occurred. W.Va.Code § 61-2-1 (1987). Moreover, this Court has previously held that the felony murder statute is applicable where "the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection...." Syl. Pt. 2, in part, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982).