639 S.E.2d 802

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Brusie "Don" LANHAM, Defendant Below, Appellant.**

**No. 33092.**

Supreme Court of Appeals of West Virginia.

Submitted: Nov. 1, 2006.

Decided: Nov. 30, 2006.

Darrell V. McGraw, Jr., Esq., Attorney General, James W. Wegman, Esq., Assistant Attorney General, Charleston, for Appellee.

George J. Cosenza, Esq., Cosenza & Merriman, Parkersburg, for Appellant.

PER CURIAM.

This case is before the Court upon the appeal of the appellant, Brusie "Don" Lanham. The appellant appeals the Circuit Court of Ritchie County's July 21, 2005, order denying his motion for a new trial following his conviction of felony-murder, burglary,[1] and unlawful assault. The appellant was sentenced to life in prison without the possibility of parole for the felony-murder conviction and received a consecutive sentence of one-to-five-years in prison for the unlawful assault conviction.

In this appeal, the appellant raises legal challenges with regard to the State's alleged destruction of potentially exculpatory evidence. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, we are of the opinion that the circuit court did not commit reversible error and accordingly, affirm the decision below.

## I.

### FACTS

In 2003, the appellant, fifty-nine-year-old Brusie "Don" Lanham, began a romantic relationship with twenty-eight-year-old Anna Moore. The appellant and Anna kept their romance a secret by meeting at the appellant's house or in other places such as hotels. Anna's father, Buck Moore, who was a very close friend of the appellant, did not know about Anna and the appellant's relationship. Anna was able to keep her relationship a secret in spite of the fact that her father Buck and mother Joyce lived with her in a trailer she owned in Pennsboro, West Virginia.

Sometime during the early spring of 2004, and unbeknownst to the appellant, Anna began to also date Jon Broadwater. For a short period of time, Anna maintained a relationship with both men without informing either man of the other's existence. By May

of 2004, Anna ended her relationship with the appellant and refused to see him.

On the morning of May 30, 2004, the appellant met Buck Moore for coffee. During the course of their conversation, Mr. Moore told the appellant that Anna had been out all night with her new boyfriend. After meeting with Mr. Moore, the appellant called Anna at her workplace demanding to know where she had been the previous night. The appellant cursed at her and stated that he knew she had another boyfriend. A couple of hours later the appellant showed up at Anna's work and approached her while she was outside during a coffee break. He demanded to know the identity of her boyfriend. He then grabbed a gun out of his car, cocked it, and asked Anna how she would like a bullet between her eyes. The appellant also told Anna that he would kill her boyfriend.

Anna did not reveal the identity of her boyfriend and the appellant got into his vehicle and stated that he was going to Doddridge County to look for him. Several hours later, the appellant returned to Anna's workplace and said he could not find her boyfriend. The appellant then demanded to see Anna that night. Anna told him that she would try to see him after she finished work for the day.

After completing her workday, Anna returned to her home and began celebrating the Memorial Day holiday with her family members, friends, and her boyfriend Jon Broadwater. During this time, the appellant called Anna and asked her to come and see him. She said she would not be able to meet with him because she had company. About one hour later, the appellant called Anna again stating that if she would not visit him that he was coming to her house. He then demanded to know if her boyfriend was there. When Anna said he was there, the appellant stated that he was coming to her home.

---

1. In light of the fact that the appellant was convicted of felony-murder with the underlying felony based upon burglary, the appellant's separate conviction for burglary was reversed. *See State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983); *State v. Elliott*, 186 W.Va. 361, 412 S.E.2d 762 (1991). In Syllabus Point 8 of *Williams* we held: "Double jeopardy prohibits an accused charged with felony-murder, as defined by W.Va.Code § 61-2-1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony."

Approximately five minutes later, Anna saw the appellant approaching her property. She then told her family to call the police informing them that the appellant was after her and would not leave her alone. The appellant, with a handgun visible on his waistline, began yelling loudly as he walked toward Anna's trailer. The appellant stood outside yelling for five or ten minutes and then stepped onto the front porch. Buck Moore then told the appellant not to enter the trailer because he was not welcome there. For three or four minutes thereafter, the appellant beat on the door demanding to be let inside.

According to witnesses, the appellant broke the glass of the front door and began firing several shots into the home with his .357 magnum revolver. Mr. Moore then returned fire with his .22 rifle. The appellant was able to get inside of the house wherein he and Mr. Moore shot each other as they wrestled together across the room. The appellant then made it to the bedroom door where the other occupants of the house had taken refuge.

Jon Broadwater was holding the bedroom door closed as the appellant demanded to be let inside. As Mr. Broadwater held the door, Anna and her family began to hide in the bedroom closet as it became apparent that the appellant would soon gain entry. The appellant then shot Mr. Broadwater who fell to the floor dead. Anna's uncle, Henry Ahouse, then struck the appellant on the head with a skillet. The appellant then fired a shot at Mr. Ahouse narrowly missing him. Anna's aunt, Jan Ahouse, managed to disarm the appellant and hold him until the police showed up a short time later. When the police arrived they discovered that Mr. Broadwater was dead, that Mr. Moore had a gunshot wound to his hand, and the appellant had been shot in the chest and in the hand. The appellant was subsequently convicted of felony-murder, unlawful assault, and burglary. This appeal followed.

## II.

## STANDARD OF REVIEW

■ In Syllabus Point 1 of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), we held, " 'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." We have further indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997).

## III.

## DISCUSSION

■ The appellant argues that his conviction should be reversed because of the State's alleged destruction of potentially exculpatory evidence in his case. In that regard, he contends that as of May 30, 2004, the day Mr. Broadwater was killed, the trailer of Anna Moore became a crime scene which should have been preserved. He points out that the trailer had a significant amount of blood in different places; inside and out; patterns of blood spatters; bullet holes in the walls and doors; and other damage.

According to the investigating officers, under the supervision of Trooper Stout, they collected evidence, took pictures, conducted a test of bullet trajectory, and gathered all of the information necessary to complete their investigation. The investigation was completed on June 2, 2004, and the trailer was returned to the Moore family.

The appellant contends that on June 9, 2004, immediately after his counsel was retained, a letter was sent to the Prosecuting Attorney of Ritchie County requesting an opportunity to inspect the trailer and surrounding property. The appellant maintains that the request was ignored. On June 24, 2004, and July 8, 2004, second and third letters were sent requesting to inspect the crime scene. Those requests also went without answer. In mid July, following a fourth letter to the prosecutor, the appellant's counsel was permitted to inspect the property. He explained, however, that by the time he was able to gain access to the crime scene, the Moore family had been living in the

trailer or had access to it for approximately six weeks. Moreover, all of the blood on the floor and other parts of the trailer had been cleaned; the various blood splatters had been removed; the walls and other parts of the trailer that had bullet holes were repaired and covered up; the front door was destroyed; the glass in the front porch removed; and the other damage to the trailer was concealed, repaired or replaced. As a result, the appellant declares that none of the evidence left at the crime scene or the scene itself was preserved for independent testing by the defense.

The appellant maintains that the State had a duty to preserve the crime scene evidence for review by the defense. He further declares that the State's failure to do so resulted in the evidence, exculpatory or otherwise, to be lost forever. Thus, he states that the mandates of this Court's prior decisions in *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), and *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995), were clearly violated leaving the appellant without the ability to contest the testimony and other evidence presented at trial against him.

 In Syllabus Points 3 and 4 of *Thomas*, this Court discussed both the preservation and destruction of evidence in a criminal proceeding. Syllabus Point 3 provides:

"A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Syl. Pt. 4, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982).

Syllabus Point 4 states:

When the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts.

 In Syllabus Point 2 of *Osakalumi*, we further discussed the State's role in preserving evidence in a criminal case. We explained:

When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

In both *Thomas* and *Osakalumi*, the defendants were found guilty largely due to the highly questionable scientific evidence that implicated them. In addition, the physical evidence used in the questionable scientific studies in those cases had been destroyed which precluded any opportunity for evaluation by the defense or for adequate cross-examination.

For example, in *Osakalumi*, the issue in the case was whether a sixteen-year-old boy shot himself in the head or whether he was murdered. The critical piece of evidence was a couch where a bullet hole was discovered two months after the shooting had occurred. Even after discovering the bullet hole, police officers left the bloodied couch at the crime scene. A few days later the couch was taken to the police department for storage, but subsequently disposed of at the Mercer County landfill due to an unpleasant odor.

The couch was a critical piece of evidence given the testimony by Dr. Sopher, the medical examiner for the State of West Virginia. Dr. Sopher's testimony, which focused on the

trajectory of the bullet through the couch, was paramount to the prosecution's contention that the death was a result of a homicide and not a suicide. In fact, it was the *only* evidence of murder presented at trial. The problem, however, was that prior to disposing of the couch, the police failed to measure either the proportions of the couch, the location of the bullet hole on the couch, or the trajectory of the bullet. The police likewise failed to properly photograph either the couch or the bullet hole. Then, two years after the disposal of the couch, Dr. Sopher, who had never actually seen the couch, testified at trial about the trajectory of the bullet based upon a detective's drawing of the couch. Moreover, the detective had put together the drawing of the couch from his memory after the couch had already been destroyed. Given those facts, this Court found that the State breached its duty to preserve evidence because the defendant was foreclosed from fully and fairly examining Dr. Sopher's testimony.

Similarly, in *Thomas,* the State did not preserve the critical bloodstain sample for independent testing by the defendant nor did the State preserve the results of the test it performed. The State did not photograph any of the electrophoresis results leading to the deprivation of the defendant's right to a full and fair cross-examination of the expert who performed the electrophoresis test. Again, we found that the State deprived the defendant of his right to a fair trial.

In the case at hand, however, there was no scientific test that implicated the appellant. Moreover, the State did not rely on a missing piece of evidence, like the blood sample in *Thomas,* or the couch in *Osakalumi,* to convict the appellant. Instead, the State relied on eyewitness testimony that clearly indicated that the appellant was at the crime scene acting in a belligerent and threatening manner. The evidence also showed that the ap-

pellant approached the front door and began pounding on it. Although the evidence is somewhat vague on the precise order of what occurred next, it is clear that the appellant unlawfully gained entry into a house where he was not welcome, armed with a firearm, and with felonious intent. A gunfight thereafter ensued causing Buck Moore to be injured and Jon Broadwater to be killed.

During the trial, the appellant was able to cross-examine every witness who implicated him in the burglary of the Moore trailer in order to reveal any facts that may have exonerated him. In addition, the appellant offered his own expert witness who testified about proper crime scene procedure. The jury heard all the evidence and convicted the appellant of burglary and felony-murder due to the fact that a homicide occurred during the burglary. *See* West Virginia Code § 61–2–1.[2]

Unlike traditional first degree murder, felony-murder does not "require proof of the elements of malice, premeditation, or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." Syllabus Point 7, in part, *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978). Thus, the State was required to prove "(1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." *State v. Williams,* 172 W.Va. 295, 311, 305 S.E.2d 251, 267 (1983) (*citing State v. Beale,* 104 W.Va. 617, 141 S.E. 7 (1927)).

As previously discussed, the State offered evidence that the appellant committed the felony of burglary by breaking and entering the Moore trailer with the intent to commit a crime.[3] The State further presented evi-

---

**2.** West Virginia Code § 61–2–1 (1991), in part, provides:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four,

> chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

**3.** West Virginia Code § 61–3–11 (1993), in part, provides:

> (a) Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the night-

dence that as a result of the commission of the burglary, Mr. Broadwater was killed. Thus, the State proved all of the necessary elements of felony-murder.

Moreover, we find no merit to the appellant's contention that the Moore's trailer should have been detained for a longer period of time by the State. Given the specific facts of this case, the trailer was properly returned to the Moore family once the investigation was completed and all necessary evidentiary samples were collected and preserved. This is not a case where the preservation of a bloody shirt, a semen sample, or even a firearm is at issue. In this case, we are dealing with the dwelling house of people of obviously limited means where two families were living at the time of the brutal homicide. It is more than likely that these individuals simply would not have been able to rent a hotel for a year, two years, or for whatever length of time would have elapsed before the appellant's trial and all of his subsequent appeals were exhausted. We cannot imagine many families who are able to afford to buy a new home at the spur of the moment. The Moores needed to get back to their home and pick up the pieces of their lives after this brutal murder and it simply would not have been reasonable to have excluded them from their home indefinitely nor is that the law of this State. It is clear to us that even when the State has a duty to preserve evidence, that duty normally does not result in the need to preserve such evidence for an indefinite and unreasonable period of time.

You simply cannot exclude a victim from his or her home forever. Likewise, you cannot tell a coal miner that he cannot use his truck to get to work for the next year because his vehicle was the subject of a crime. We are dealing with people's livelihoods and we must always approach situations like the one at hand with common sense and reasonableness. We cannot allow for a governmental bureaucracy to allow innocent victims to continue to be victimized.

We do, however, recognize that some crime scenes must be preserved for lengthy

periods of time based upon the specific circumstances of a particular crime and the ability to adequately preserve a specific piece of evidence. This is not such a case. As we have discussed, the investigators conducted a full and complete investigation and preserved the necessary evidence in numerous ways including photographs. Upon completing their investigation there simply was no reason to further exclude these victims from returning to their home.

In summary, upon careful review of the record, we find no evidence to conclude that the State withheld or destroyed any exculpatory evidence from the defense. The evidence of the burglary was provided by eyewitness testimony at trial that the appellant broke into the trailer. Additional evidence was provided by Ms. Ahouse's call to 911 for help wherein she declared that the appellant was "at the front door trying to get in." This was followed by Ms. Ahouse telling the 911 operator that the appellant "just broke the glass" of the front door. The State played the 911 tape to the jury at trial. It is clear to us that the primary evidence in this case was eyewitness testimony. The prosecution did not rely on physical evidence at the scene that was lost or was needed by the appellant to reproduce tests. Likewise, there was no missing exculpatory evidence and the State did not fail to photograph the crime scene. In fact, the State gave the appellant approximately 100 photographs of the crime scene. We see no evidence or indication that any exculpatory evidence was withheld or destroyed by the State. It is for these reasons we find that the appellant's conviction should be affirmed.

## IV.

### CONCLUSION

Accordingly, for the reasons stated above, we affirm the appellant's conviction.

Affirmed.

---

time, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining

thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary.