**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-6540

JAMES N. ESTEP,

Petitioner - Appellant,

v.

DAVID BALLARD, Warden, Mount Olive Correctional Complex,

Respondent – Appellee,

and

DARRELL V. MCGRAW, JR.,

Respondent.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:10-cv-00396)

Argued: September 18, 2012                Decided: November 7, 2012

Before WILKINSON, MOTZ, and GREGORY, Circuit Judges.

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Motz joined. Judge Gregory wrote a dissenting opinion.

**ARGUED:** Morgan Ann McCall, WAKE FOREST UNIVERSITY, School of Law, Appellate Advocacy Clinic, Winston-Salem, North Carolina, for Appellant. Robert David Goldberg, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for

Appellee.  **ON BRIEF:** John J. Korzen, Director, Leslie Cockrell, Third-Year Law Student, Hannah Davis, Third-Year Law Student, WAKE FOREST UNIVERSITY, School of Law, Appellate Advocacy Clinic, Winston-Salem, North Carolina, for Appellant.  Darrell V. McGraw, Jr., Attorney General, Charleston, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

James N. Estep petitions for a writ of habeas corpus in connection with his sentence of life without possibility of parole for first-degree felony murder. On direct appeal of his conviction, the Supreme Court of Appeals of West Virginia rejected his Sixth Amendment claim of ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). On federal habeas review, the District Court for the Southern District of West Virginia held that although the performance of Estep's trial counsel fell below a reasonable standard of professional competence, Estep failed to establish prejudice resulting from this error.

In light of the deferential standards for reviewing state court judgments under the Antiterrorism and Effective Death Penalty Act, we agree that petitioner has failed to demonstrate a reasonable probability that the outcome of the trial would have been different had his counsel's performance not been deficient. We therefore affirm the judgment of the district court.

I.

A.

Shortly before midnight on November 16, 2001, Estep, who was eighteen years old, was traveling through West Virginia with

his girlfriend when their car broke down in front of a stranger's home. The owner of the home, sixty-year-old Donovan Barringer, attempted to help restart the car, but the attempt was unsuccessful. Estep then turned on Barringer, striking him in the head three times with a baseball bat. Estep dragged Barringer into a field and burglarized his home, stealing his wallet, two firearms, and his pickup truck. Barringer's family discovered his lifeless body the next morning. Estep and his girlfriend were apprehended that day at a hotel in Kentucky. They had spent the stolen money on a variety of items, including a CD player, CDs, posters, and hair dye.

Estep was tried in 2003 at a unitary trial -- that is, a proceeding in which the issues of guilt and, if necessary, sentencing are tried together. The jury convicted him of first-degree felony murder and nighttime burglary and declined to issue a discretionary recommendation of mercy, which would have rendered him eligible for parole after no fewer than fifteen years pursuant to West Virginia Code § 62-3-15.[1] The trial judge

---

[1] In pertinent part, this statute provides that

> [i]f [a] person indicted for murder is found by the jury . . . guilty of murder of the first degree, . . . he or she shall be punished by imprisonment in the penitentiary for life, and he or she . . . shall not be eligible for parole: Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person

(Continued)

4

sentenced Estep to life in prison without the possibility of parole on the murder charge and one to fifteen years (concurrently) on the nighttime burglary charge.

B.

On appeal to the West Virginia Supreme Court, Estep argued, among other points, that he was denied a fair opportunity for receiving mercy because his trial counsel provided ineffective assistance under the Sixth Amendment by failing to object to the prosecution's invocation of evidence establishing that Barringer was a kind and helpful person. The West Virginia Supreme Court summarily rejected Estep's direct appeal. In a subsequent state collateral proceeding, Estep did not raise an ineffective assistance claim relating to that evidence. The circuit court denied relief, and the West Virginia Supreme Court affirmed.

The challenged "good character evidence" can be divided into four chronological categories. First, the prosecution made

shall be eligible for parole . . . , except that . . . such person shall not be eligible for parole until he or she has served fifteen years.

W. Va. Code § 62-3-15. West Virginia courts have held that the question of mercy lies solely within the jury's unfettered discretion -- to such an extent that a judge may not even suggest factors for consideration. See State v. Triplett, 421 S.E.2d 511, 520 (W. Va. 1992); State v. Miller, 363 S.E.2d 504, 508-09 (W. Va. 1987); see also Billotti v. Legursky, 975 F.2d 113, 117 (4th Cir. 1992) (explaining this framework).

5

comments concerning Barringer's character during its opening statement, including the following:

> Donovan Barringer is going to be remembered in this courtroom during this trial as a kind and gentle man who sought out a very simple lifestyle, and a man who had a very large heart. The kind of fellow that always was willing to give anything he had to someone else he thought needed it. He was a man that you will find to have been loved by his family, and a man who is now being mourned by his family.
>
> After you discover the facts about this kind and gentle man, you're going to find it especially painful to think that he lost his life while he was attempting to help a stranger. . . .
>
> . . . .
>
> . . . And you're going to discover that Donovan Barringer was indeed a kind and gentle man who was in his own house, minding his own business, when someone knocked on the door and said their car broke down. And you're going to discover that [he] did what was natural for him, he offered to help.

Second, in questioning Greg Barringer ("Greg"), the victim's nephew, the State elicited good character evidence on several occasions. The prosecution first asked Greg to describe his relationship with his uncle. Greg explained that he

> was like a brother, a father, all rolled up into one. He was my sounding board. He and I did all kinds of things together, and he was my encourager. He gave me advice. Taught me all kinds of things. Taught me how to throw a baseball, how to catch a football, how to fish and hunt, and how to drive a car. Just all kinds of things like that. We spent lots of times, a lot of time hunting and fishing. Camping. Just all kinds of things together.

The prosecution then queried what Barringer's personality was like, with Greg answering that he

6

was the most humble person that I ever met in my life. Never beat his own chest, never bragged. He bragged a lot, but he always bragged about his family. I never once in my life heard him brag about himself. He was hard[-]working, honest, patriotic, patient, kind, gentle, all kinds of adjectives that would describe [him] and in the best of light. He was a strong moral fiber. He was an extremely hard-working individual. He worked as a union laborer and never shirked, never shied away from hard work. Any dirty job, hard job, he was always willing, without ever complaining, to do the work.

Next, in response to the State's request to describe whether Barringer "ha[d] a tendency to be wanting to help others" and was "generous," Greg stated that his uncle

was a very generous person. If he had -- and I've seen him do it time after time -- if he had two of anything and one of them was worn and one of them was new, he would give the other person the new one. He was generous to a fault. He helped people. And I've found out since his death lots and lots of people have come up to me and told me the things that he did for them. He raised a garden, he gave away literally tons of food to people. He helped people when he would hear that they were out of work. He would help them with food and money, and nieces and nephews and sisters. He was always helping everybody. If there was something that needed done around your house, you didn't have to call him. If he knew about it, there he was. And he always jumped in, you never had to ask him, it was always he was there to do it and willing and happy to do it.

Moreover, in response to the question whether Barringer had any hobbies at the farm, Greg replied that "[t]he farm itself was a hobby because he never made any money on it. He always gave everything away." The prosecution then prompted, "Is there a story about firewood?" to which Greg replied that

7

at the time that he was murdered, there were stacks of firewood around his barn, but [he] didn't have a fireplace. He cut firewood and gave it away to people that needed it. He had fifty-some acres of land and he always thought it was a good way to help people, that he would just give it to them as they needed it.

Greg also testified about Barringer's care of his sick and elderly mother.

Third, the State referenced Barringer's good character when cross-examining Estep by asking the following questions: whether Barringer "came out of his warm house, at 11:30 at night on a cold November night to help you"; whether Barringer "ha[d] to do that"; whether "that [was] a kind gesture on his part"; whether Estep "kn[e]w anything about the fact [Barringer] was taking care of his elderly mother in the house"; whether Barringer was "a nice man" who "came out to help"; and whether Estep thought that "if you would have told him that perhaps you were hungry that maybe he would have offered you some food."

Fourth, the State invoked good character evidence several times during its closing argument. The prosecution began by saying that "[a]t the beginning of this trial I told you that Donovan Barringer was a kind and gentle man that was minding his own business . . . when someone knocked on his door and asked him for help." The prosecution also stated that Barringer was "the kind of man that would help anybody." And the prosecution asserted that Barringer was "a kind and gentle man who loved his

8

family and would give anything to anybody" and that "[h]e was the kind of man that would work in the greenhouse and plant seeds and raise flowers and give vegetables away and cut firewood and pile it up to the barn to give it to people." Finally, the prosecution stated that "[w]e live in a community full of wonderful great people like him."

Defense counsel did not object to any of these statements, nor did the defense itself offer evidence concerning Barringer's character.

C.

On March 25, 2010, Estep filed a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), in the U.S. District Court for the Southern District of West Virginia. Among other claims, he renewed his ineffective assistance argument based on the good character evidence.

On March 21, 2011, the district court dismissed the petition. Applying the framework set forth in Strickland v. Washington, 466 U.S. 668 (1984), and focusing on Greg Barringer's testimony, the court found that the performance of Estep's trial counsel fell below a reasonable standard of professional competence but concluded that Estep was unable to establish that he had been prejudiced as a result.

9

The district court granted Estep's application for a certificate of appealability on this claim, and the present appeal followed.

## II.

Although this court's review of a district court's denial of habeas relief to a state petitioner is de novo, see Wolfe v. Johnson, 565 F.3d 140, 160 (4th Cir. 2009), we review the underlying state court judgment pursuant to the deferential standards set forth in AEDPA. As applicable here, AEDPA provides that this court should grant the writ only if the adjudication of the relevant claim in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Where, as here, the underlying state court decision "is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011). Moreover, "[t]his is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." Id.

To establish ineffective assistance under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must show both (1) that his counsel's performance was deficient and (2) that he suffered prejudice as a result. First, a defense attorney's performance is considered deficient if the "representation fell below an objective standard of reasonableness." Id. at 688. The Supreme Court has specified that because of the inherent difficulties in "eliminat[ing] the distorting effects of hindsight," courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Second, counsel's deficient performance results in prejudice if there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," where "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." Id. at 694. The mere conceivability of some effect on the outcome is insufficient. Id. at 693. Because of the deference due both trial counsel and the initial outcome under Strickland's respective prongs, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010).

As the Supreme Court made clear just last year, Strickland's deferential standards become doubly deferential when deployed in the context of federal court review of a state

11

court judgment under AEDPA. In <u>Harrington v. Richter</u>, the Court explained the interaction of these standards as follows:

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult [as compared to establishing ineffective assistance under <u>Strickland</u> alone]. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. . . . Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

131 S. Ct. at 788. Mindful of this admonition, we approach Estep's ineffective assistance claim in the deferential posture mandated by the Supreme Court.

## III.

## A.

Estep argues that his trial counsel's failure to object to the prosecution's repeated invocations of good character evidence concerning Barringer amounted to ineffective assistance under <u>Strickland</u>.

As for <u>Strickland</u>'s performance prong, Estep contends that the good character evidence was plainly inadmissible under West Virginia Rule of Evidence 404(a)(2), which proscribes the prosecution's introduction of evidence relating to a victim's

12

character to prove action in conformity therewith unless the defense has opened the door by itself discussing the victim's character or by contending that the victim was the first aggressor. There is no argument that either exception applies here. In light of this rule, we see no reason to overturn the district court's conclusion that trial counsel's failure to object even once to the substantial quantity of good character evidence elicited by the prosecution constituted deficient performance.

That is not the end of the inquiry, however. Under Strickland's prejudice prong, Estep must also demonstrate a reasonable probability that but for his attorney's deficient performance, the result of the trial would have been different. As his brief explains, Estep "freely admitted" that he killed Barringer. "The only real issue" at trial, therefore, "was whether the jury would give a recommendation of mercy, allowing the possibility of parole."

As the district court correctly noted, "[i]n deciding whether or not to afford a defendant a mercy recommendation [under West Virginia Code § 62-3-15], the jury may consider and assess all of the evidence presented at trial." See Billotti v. Legursky, 975 F.2d 113, 117 (4th Cir. 1992). Ultimately, while the good character evidence did constitute a component of the prosecution's case, it was neither the exclusive nor dominant

13

focus of the State's argument against mercy.[2]  Based on the totality of the evidence, as explained below, we conclude that it would not have been unreasonable for the West Virginia Supreme Court to determine that Estep failed to establish a reasonable probability that the jury would have recommended mercy absent trial counsel's failure to object to the good character evidence.

B.

The above conclusion is sound for the following reasons. First and most fundamentally, the circumstances surrounding the murder were "particularly brutal," to quote the district court. The facts of the crime itself (apart from the more general good character evidence) indicate that Barringer was acting as a Good Samaritan on the evening in question.  He left the comfort of

---

[2] A quantitative analysis of the record supports this qualitative conclusion.  Tracking the categories delineated above, one finds that the challenged good character evidence amounted -- at most -- to (1) approximately one of six trial transcript pages of the prosecution's opening statement, (2) four of seven and one-half pages of Greg Barringer's testimony, (3) one and one-half of more than thirty-three pages of the prosecution's cross-examination of Estep himself, and (4) a bit more than one of over twenty-one pages of the prosecution's closing argument.

Whereas good character evidence comprised a substantial portion of Greg's testimony, it bears emphasis that he was only one of nine witnesses called by the prosecution during its case-in-chief, and Estep does not argue that Barringer's character was a focus of any other prosecution witness's testimony.

his own home late on a November night in order to assist two strangers stranded by the wayside. Barringer's kindness cost him his life.

Estep's own testimony at trial about the murder was particularly damaging in this regard. Estep testified that he hid a baseball bat in the sleeve of his jacket and clubbed Barringer on the back of the head: "he didn't see it coming," Estep confirmed. Barringer emitted a "painful agony type of moan" and fell to the ground after the first blow, but the ruthless attack continued. Estep swung the bat again, and Barringer made another noise. It was only once Barringer lay silent, after the third blow, that Estep ceased clubbing his skull. Rather than attending to Barringer's injuries, Estep dragged his mangled body into a field, leaving him there to die. Estep never summoned medical assistance -- not even anonymously after leaving the scene. Besides demonstrating the utter heartlessness of the crime, these conceded facts would have permitted the jury to conclude that Estep acted with the intent to kill -- which, though not a required element of the crime, see State v. Lanham, 639 S.E.2d 802, 807 (W. Va. 2006), significantly undermined the defense's case for mercy.

Second, the evidence demonstrates that Estep displayed an alarming absence of remorse in the hours following the gruesome attack by -- among other actions -- burglarizing Barringer's

15

home (where his ailing, eighty-seven-year-old mother lay in bed); stealing his pickup truck; driving across state lines; checking into a hotel; and frittering away Barringer's money on a CD player, CDs, and posters. Damaging also was the fact that Estep and his girlfriend purchased two packages of hair dye the morning after the murder -- from which the jury could have inferred that they were intent on evading capture.

Third, Estep's counsel presented a number of salient arguments for mercy at trial. The defense's closing argument is illustrative. Estep's attorney began by asserting that his client had acted admirably by "taking responsibility, confessing to what he did, facing the Prosecutor, the family, and . . . more or less accept[ing] the fact that he was going to have to face the consequences of his acts."

Counsel proceeded to argue that Estep had not, in fact, intended to kill Barringer, instead maintaining that he and his girlfriend found themselves in dire straits and simply "wanted to get somewhere, get some clothes, food and money." To make matters worse, Estep "thought [his girlfriend] was pregnant," his counsel emphasized. They were "two, what you may call, desperate people, perhaps homeless." He also contested the prosecution's argument that Estep had demonstrated a lack of remorse, arguing that Estep was so distraught over the

16

possibility that he had ended Barringer's life that he contemplated suicide.

The defense's closing argument underscored Estep's youth as well, encouraging the jury to place themselves in his shoes:

> Age 18 is an important year in anybody's life. . . . You're legally an adult, but you have the mind more or less of a child. Each of you may be able to remember when you were that age. Some it's different than others. But . . . we all could have made some serious mistakes.

Finally, defense counsel described Estep's grief at the recent deaths of his mother and brother -- with whom he was very close -- from a hereditary liver disease. He reminded the jury that Estep had to be hospitalized because of his grief over his mother's passing and that he began abusing prescription drugs in order to dull the pain. Returning to the theme of personal accountability, defense counsel noted that although Estep had admitted to taking painkillers the evening of the murder, "he didn't blame it on drugs." Instead, "[h]e took responsibility and admitted what he did."

That Estep's attorney established a long list of possible mitigating factors for the jury to consider is beyond debate. Although these arguments ultimately proved unavailing, the good character evidence did not detract from the defense's ability to present a strong affirmative case for mercy. As the district court concluded, "Petitioner offered his most compelling

17

arguments for mercy . . . . However, the jury was simply not persuaded. The Court therefore cannot say with a reasonable probability that the jury's decision would have been different if counsel had properly objected to the introduction of the character evidence." Neither can we.

IV.

There is no question about the brutal nature of the crime. There is no question about Barringer's kindness on the evening in question. There is no question about the manner of his death. There is no question about Estep's guilt. The fact that the jury declined mercy in light of the arguments presented by Estep's attorney -- which the good character evidence did not taint -- strengthens the district court's conclusion that the judgment of the West Virginia Supreme Court should not be collaterally overturned. Estep has simply failed to establish under AEDPA that he suffered <u>Strickland</u> prejudice as a result of his counsel's errors at trial.

Heeding the deferential standard for reviewing state court dispositions of <u>Strickland</u> claims under AEDPA, we hold that the decision of the West Virginia Supreme Court rejecting Estep's ineffective assistance claim was not an unreasonable application

18

of clearly established federal law.  We accordingly affirm the judgment of the district court.[3]

AFFIRMED

---

[3] It is worth noting the many things that our friend in dissent does not contest.  The dissent does not take issue with the utter brutality of the crime other than to offer the general observation that all murder is brutal.  Likewise, the dissent does not dispute the defendant's callous and insouciant behavior in the aftermath of the murder other than to state, paradoxically, that it somehow presented an additional argument for mercy.  Nor does the dissent quarrel with the fact that the circumstances of the crime itself cast the character of the victim in a sympathetic light.  Finally, the dissent attempts to reargue the very points for mercy that Estep advanced before an unpersuaded jury.  Instead, in insisting that one type of evidence overshadows all the rest, the dissent downplays the totality of evidence before the trier of fact and overlooks the sense of perspective and proportion that a reviewing court under AEDPA is required to exercise.  To say in the face of all this that the West Virginia Supreme Court indulged in an unreasonable application of clearly established law is a sharp and unwarranted conclusion.

GREGORY, Circuit Judge, dissenting:

While I agree with the majority's holding that Estep's counsel was ineffective for repeatedly failing to object to inadmissible character evidence, I disagree with the conclusion that there has been no prejudice. The majority accurately states that the standard of review under AEDPA demands a high level of deference when considering ineffective assistance of counsel on federal habeas review. But, while AEDPA sets a high standard, it does not set an impossible one. I believe that the extensive, repetitive and pivotal use of prohibited evidence in this case meets the AEDPA standard.

The State's sole discernible theme at trial -- that Estep killed a "kind and gentle man" who was a virtual saint in his community -- was a calculated attempt to use inadmissible evidence to pull at the heart strings of the jury. The framing of the theme early in opening argument makes the State's objective clear: "After you discover the facts about this kind and gentle man, you're going to find it especially painful to think that he lost his life while he was attempting to help a stranger." This framing shows that the State made a flagrant appeal to the jury's emotions as they relate to the victim's character. The prosecution directly and unmistakably communicated to the jury that it should make a decision based on facts which should never have been admitted.

20

The pervasive, strategic use of prohibited good character evidence of the victim makes this case exceptional. I could find no case -- and neither the majority nor the State points to any case -- that approaches this level of abuse for the relevant evidentiary rules. Instead, the majority engages in mathematical calisthenics in an attempt to minimize the gravity of the disputed evidence. Such a simplistic approach demeans the spirit of the Sixth Amendment protections at issue. Prejudice is not a question of whether 10 percent or 25 percent or 50 percent of the prosecution's evidence was inadmissible. It is a question of impact on the jury. When the prosecution communicates three paragraphs into its opening argument that it intends to persuade the jury using impermissible evidence and then successfully introduces and re-visits that impermissible evidence at each and every stage of the trial, it is unreasonable to conclude that the jury did not respond accordingly.

Here, the State elevated the victim to virtual sainthood. The prosecution continually illustrated its theme by introducing facts that presented the victim as: a "mentor"; the most "humble" of men; a "hard-working, honest, patriotic, patient" man; a man who "never complained"; a man "loved by his family"; a "generous" man; a man who carried on as a farmer only so that he could give "literally tons of food to people"; a man who cut

21

firewood so that he could give it to people for free; a man who took care of his "frail and bed ridden" mother, tied her shoes, fed her, kept her company, and was her sole support and companionship. None of this information was even arguably admissible. But, the State took full advantage of Estep's non-responsive counsel. With the reins of evidentiary law cast aside, the State took the opportunity to create a detailed portrait of the victim designed to win over the emotions of the jury. It would be unreasonable for any court to conclude that there was not, at very least, a reasonable probability that this portrait of a saintly man did not have a determinative effect on the jury's mercy decision.

The majority adopts the district court's tenuous reasoning that there was no prejudice because "the crime itself was particularly brutal." This borders on tautology. Murder is particularly brutal by nature. What matters for our purposes is the jury's perception of brutality. Any attempt to place this crime on some imaginary spectrum between "brutal" and "humane" would be inextricably entangled with the inadmissible character evidence. The conclusion that a jury would not consider the murder of a saint-like man whom his family and community depended on more brutal than the murder of a relatively anonymous victim ignores the basic human capacity for empathy.

The majority also reasons that there is no prejudice in this trial because "the good character evidence did not detract from the defense's ability to present a strong affirmative case for mercy." Indeed, Estep presented evidence that showed he was just eighteen-years old when he committed his crime, that he was clinically depressed because he had recently lost his mother and brother, that he had begun to abuse prescription drugs that his brother had given to him, that he did not intend to kill his victim, and that he took responsibility for the crime. But, the majority pretends this evidence somehow works against a finding of prejudice. Quite to the contrary, this evidence only moves the case closer to the tipping point on the question of mercy. It makes it all the more likely that the inadmissible character evidence was outcome determinative.

The majority also believes its holding sound because Estep did not immediately display remorse after his crime was complete, but instead made several purchases of trivial items with the money he had stolen. There are two problems with this line of reasoning. First, remorse is not a time-limited emotion. While Estep may not have felt remorse in the hours or days after his crime, that does not preclude a finding that he was remorseful at trial. See United States v. Rodriguez, 959 F.2d 193, 197 (11th Cir. 1992) (explaining that conduct illustrating remorse for the purpose of mitigation may take

23

place "prior to, during, and after the trial"). The second, related problem with the majority's reasoning is that Estep's petty purchases after the crime serve to reinforce the pro-mercy argument that Estep was young and immature at the time.

This case does present a challenge in that West Virginia law does not provide concrete factors to guide jury deliberation on mercy. See State v. Miller, 363 S.E.2d 504, 508-09 (W. Va. 1987). Instead, the jury considers the evidence as a whole in deciding whether to recommend mercy. Id. While this legal framework makes review under AEDPA difficult, it cannot completely insulate a state court. Such a conclusion would mean that a defendant's Sixth Amendment right to effective counsel only adheres when the legal underpinnings provide for clear and convenient review.

Our precedent instructs us to look at the totality of the evidence when considering prejudicial effect on habeas review. Elmore v. Ozmint, 661 F.3d 783, 868 (4th Cir. 2011). The totality of the evidence before us in this case establishes -- at very minimum -- a reasonable probability that a jury would have made a recommendation for mercy if Estep's counsel properly objected to the good character evidence of the victim. I do not believe that it is reasonable to conclude otherwise. From soup to nuts, the State's case emphasized and relied upon inadmissible character evidence. Our complicity in this sort of

24

egregious abuse of the rules of evidence only serves as a signal to certain prosecutors that they are free to play fast and loose when the opportunity presents itself.

One court recently noted in an en banc opinion that "if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss the Great Writ good-bye."  Doody v. Ryan, 649 F.3d 986, 1003 (9th Cir. 2011).  I fear the inkpad may be opening.